Brian K. Jackson (15296)
Brian K. Jackson, LLC
341 S. Main St. Suite 500
Salt Lake City, Utah 84111
Phone: (801) 441-8922
Fax: (801) 534-1948
brianj@bjacksonlaw.com
Attorney for Richard Taylor

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Richard Taylor;<br>        Plaintiff,<br><br>v.<br><br><br><br>Western Governors University;<br>    Defendants. | **AMENDED COMPLAINT**<br><br>Civil No.: 2:18-cv-00780-PMW<br><br>The Honorable Paul M. Warner<br><br>***JURY TRIAL REQUESTED*** |

Plaintiff, Richard Taylor, in his individual capacity now brings this action by and through his legal counsel of record, Brian K. Jackson of Brian K. Jackson, LLC in the United States District Court for the District of Utah, Central Division and hereby allege and complain the following facts and requests this court that compensation for damages that have been incurred thereby be entered based on the foregoing legal causes of actions against Western Governors University, Defendant:

### I.    PARTIES, JURISDICTION, VENUE

1.    Plaintiff, Richard Taylor is a former employee of Western Governors University until he was terminated on or about July 10th, 2018 and is a resident of Salt Lake County of which he permanently resides.

2.      Defendant, Western Governor's University is a private non-profit education institution that provides higher learning for individuals after their secondary education and was the former employee of Plaintiff, Richard Taylor whose principal headquarters are located in Salt Lake City, Utah and is incorporated within the state of Utah located at 4001 SOUTH 700 EAST STE 700 Salt Lake City, UT 84107. The registered agent is located at the same location. The entity also has other branches throughout the U.S. including in the state of Indiana, Washington, Texas, Missouri, Tennessee, Nevada, North Carolina and Ohio. They have a college of business, information technology, teachers college and a college of health professions.

3.      Subject matter jurisdiction is proper pursuant to with a matter arising under a federal law under 28 U.S.C. Section 1331 pursuant to 18 U.S. Code § 1038 as well as the additional affiliated federal code violations found in that claim and the affiliated statutory recklessness claim.

4.      The incidents in question also occurred in Salt Lake County, Utah.

5.      Personal Jurisdiction over the Defendant is proper as the entity is incorporated within the state of Utah and its principal headquarters are located within the state of Utah.

6.      Venue is proper as the matter and incidents alleged herein arose within Salt Lake County, State of Utah.

## II. GENERAL FACTUAL ALLEGATIONS

7.      Richard Taylor was a former employee of Western Governors University, at 43 years old when these events took place. Mr. Taylor worked with the Salt Lake City Branch and had recently been promoted in 2018 to tier-3 enrollment counselor. On or about the 10th of July, 2018 Mr. Taylor received a text from the Human Resources Department stating, "Hi Ric, this is

Tracy Miller with People and Talent at WGU can you please give a call it is urgent."

8.      Mr. Taylor called the Human Resources Department thereafter and talked to Tracy Miller who told him that somebody came to them and told them that Mr. Taylor had threatened to bring guns and bombs into the office. Concerned about the seriousness of this matter, he asked that he speak to the manager of the department, Ms. Miller's boss, Crystal. He noted that he had never made a threat like that to anybody and would not be able to pay his bills if he was just to wait during the investigation without pay. He asked them who made such a claim and they told him that they could not because it was confidential. He was told that he could not come onto to the property again until they completed an investigation and that he was suspended with pay until the investigation was completed and that it was still ongoing. He also learned that there was tighter security at the company thereafter. Mr. Taylor never had the circumstances explained to him beyond that initial conversation.*(See attached text messages)*

9.      Mr. Taylor was caught off guard as the allegations against him were fake and fabricated which he communicated to the University at that time. He doesn't own any guns at his home nor does he have or possess or has or had plans fabricate explosive or weapons of mass destruction. He also indicates he was not pulled out of his desk as soon as the company knew about it. The police and other investigators never called or questioned Mr. Taylor, indicating the actual lack of seriousness that the University took as to the claim when it was first reported.

10.     Around this time, Crystal also contacted IT (Information Technology) and told IT to cancel to credentials and access for Mr. Taylor. Crystal also told IT that the reason being, noting that Mr. Taylor had stated he would bring guns to work. IT asked if the school needed to be put on lockdown or if the police needed to be contacted and Crystal responded in the negative and

noted that it wasn't serious. This was never communicated to Mr. Taylor regarding Human Resource's perception of the lack of seriousness of the claim, in light of them placing him on paid administrative leave.

11.     These are serious allegations that carry a potential federal investigation and potential criminal charges as well as confinement during a federal investigation without bail. This includes among other potential charges, charges under the US Patriot Act and the statutory violations found in this complaint including attempts to use weapons of mass destruction, attempts to destroy public property, attempts to kill public citizens lawfully convened, possession of and fabrication of weapons of mass destruction; possession of illegal firearms; as well as state criminal charges of attempted murder, mass shootings and riots. These charges carry life sentences including the death penalty. An individual in San Francisco was just given a minimum of 15 years in prison for making such a plot.

12.     Prior to this, the only incident Mr. Taylor had with Human Resources or a complaint made was on our about February of this year was when he talked about the history of the LDS church and the death of Joseph Smith and succession of leadership in the break-room. This was an area of emphasis he had worked on for his masters at the University of Utah and was in relation to inquiries of other employees.

13.     In relation to the most-recent allegations, Mr. Taylor cannot think of any co-worker that would make such allegations against him or have reason to make such allegations against him or misconstrue a conversation he had. The only individuals he interacted with face-to-face with were his co-workers that worked on the same floor as him. From that, only an employee of the University could make the false allegations against Mr. Taylor. This is in light of the fact that the

complaint came from Human Resources, indicating the complaint was made internally by an individual by an employee to that department. The only conversation he can recall that had any attenuation to what was alleged was the conversation about Joseph Smith. He does not have a criminal background nor is he being treated or has been diagnosed for any kind of mental illness.

14.     He was originally hired in October of 2106 and them left the University to earn money elsewhere for a month and was gladly re-hired after a month's time on October 23rd, 2017 as an enrollment counselor consultant with an hourly rate of $17.00 and hour including health care benefits and his work history includes working in the same area of expertise with other prior colleges. He would work over the phone with enrollment and counseling of prospective students. He had been promoted to a leader within a team and took on managerial responsibilities on occasion and helped lead to innovations of processes as well. He was making $17.68 an hour when he was ultimately terminated. *(See attached paystubs)*

15.     Mr. Taylor appreciated his employment with WGU given their openness and truthfulness to students about their enrollment and tuition. He had let his manager know that he had intention to make a career of WGU and interviewed for the promotion two times. The company had also been flexible and accommodated him as he had to deal with with the loss of his wife in early 2018, also of which indicates the University was aware of that situation and the additional emotional vulnerability he was dealing with at that time. WGU was his only source of income at that time.

16.     Over the course of the next 8 days he was contacted regularly. He was continuously told not to return to work and that the investigation was still ongoing. Mr. Taylor was never contacted and told to tell his side of the story during this time. On July 11th, 2018, Human Resources noted

in a text, "Hi Ric, I am still gathering information. I hope to have an update tomorrow. You will continue to be paid through the investigation. As a reminder please do not return to work. Thank you." On July 12th Human Resources sent the same information. On July 13th, 2018, Human Resources noted in a text message, "Thanks for your patience Ric, I hope to have an update by the end of the day Monday. Please do not return to work. You will continue to be paid through the investigation. Thank you." On July 16th, they noted in a text "Hey Ric, continuing to gather information. Please do not return to work. You will continue to be paid through the investigation. Thank you."

17.     On or about July 18th at 10 AM, Mr. Taylor spoke with Tracy with Human Resources and she let Mr. Taylor know that he was let go. He was also told that they would send him his things and a separation agreement that included one month pays and three months of medical coverage.

18.     On July 20th, 2018, Human Resources noted that his last check would be mailed to him that day with the pay for when he was "on administrative leave during the investigation as well as any accrued and unused vacation time."

19.     They mailed him a settlement with a severance agreement of $2,828.8 and COBRA benefits up to October 18th, 2018. Human Resources e-mailed the agreement noting that it was a "separation document" that they had mentioned in a phone call earlier. However, the language of the agreement is language arising from a legal dispute as if Mr. Taylor had already raised and negotiated his claims of legal liability with the company as if it was a settlement agreement of all of his claims against WGU and not just a severance agreement related to the amount the company would pay Mr. Taylor for terminating him at that time. The document was titled

"Settlement Agreement and Release." He was also not informed to consult with counsel prior to signing it as an unrepresented individual when the contract was sent to him. *(See attached settlement Agreement; e-mails)*

20.     Mr. Taylor inquired on July 30th to Human Resources through e-mail on how his "exit from WGU will be classified when future potential employers call for a reference. Could you please let me know what my official status will be once we are done with this whole process?"

21.     Human Resources responded noting that "Employment verifications are handled by the worknumber, an external vendor that WGU contracts to provide employment verifications. The only information that The Work number has and will confirm is your employment start date, end date, title and salary."

22.     The agreement included a right not to sue the company arising under the ADEA, ERISA, FLSA, FMLA and OSHA claims agreeing that the last day worked was July 18th, 2018 for claims such as:

> Wrongful discharge, breach of alleged employment contract, breach of the covenant of good faith and fair dealing, termination in violation of public policy, intentional or negligent infliction of emotional distress, fraud, misrepresentation, defamation, interference with prospective economic advantage, failure to pay wages due or other monies owed, failure to pay pension benefits, conversion, breach of duty, interference with existing economic relations, punitive damages, retaliation, discrimination.

23.     It also included an additional clause of a covenant not to sue and that there were no pending lawsuits in federal or state court of any kind as well as a clause of a release of waiver of any liability the company may toward Mr. Taylor.

24.     It also included a confidentiality agreement not to discuss any of the information of the agreement to anyone and to "agree to reveal only that the matter has been resolved." The

agreement also included a clause of no admission of liability of the University and that Mr. Taylor would agree not to seek employment with the University. The agreement included an additional non-disclosure agreement as well as a release of "known and unknown claims" and that the terms were derived through "mutual compromise" The agreement had the signature line for Mr. Taylor and Bonnie Pattee, the VP of people and talent.

25.     As a result of the situation described above as to Mr. Taylor, Mr. Taylor filed information regarding this incident with the Federal Bureau of Investigation.

26.     As result of the situation described above, Mr. Taylor suffered from unneeded unwanted anxiety past and future, humiliation, grief, frustration, general fear, feelings of hopelessness and helplessness, depression, lack of sleep, damages to reputation in his career field and in the community as a whole, exacerbated pre-existing emotional conditions regarding the grievance of the recent passing of his wife of which the University was aware of  the additional emotional vulnerability at the time of the allegations that were made against him and when they terminated him as noted above during his grievance process, the allegations and complaints and associated feelings of which Mr. Taylor will have to deal with the rest of his life to the egregious and volatile allegations made toward him and his propensity to commit an act of serious moral turpitude at a educational institution where he worked and toward the community at large.

27.     He also suffered from consequential damages, in that he had to pay for all utilities, rent and expenses from other sources to support himself instead of the sources of his income through the company as well as medical benefits.

### III.     Legal Claims

28.     As a result of what has occurred, Mr. Taylor has the following causes of action against

WGU and incorporates the above-mentioned facts into the causes of action below:

### A.  Slander / Libel per se / Defamation of Character

29.     **Count 1:** Defamation of character, slander, libel per se, for an employee or co-worker communicating false information to the University and the information that was communicated within the University apart from Mr. Taylor regarding Mr. Taylor that he had threatened to bring guns and bombs to work on or about July of 2018. The allegations of which involved and related Mr. Taylor's potential and future economic relations with the company and with future companies claiming that he had intentions to cause severe and gross harm to individuals to their persons, life and limbs on a mass scale at the place of his employment.

30.     **Count 2:** For Human Resources, breaching confidentiality when they unnecessarily communicated to IT the reason why Mr. Taylor's access and credentials needed to be terminated for claiming he planned to bring guns to work. For also claiming that Mr. Taylor in fact said those word prior to a final finding in the investigation and knowing that the allegations were false in light what Mr. Taylor told the University and also knowing that the complaint was not in fact serious, the actions of which indicate malice, knowing that the statements were false or recklessly claiming the statements were true without an investigation and knowing that the claims were not actually serious.

31.     That the communication of which is slanderous and libelous per se in that it is in relation to Mr. Taylor and his career and profession and trade as well as the information also relates to criminal activity of moral turpitude. The communication of which WGU also incorporated as their own allegations against Mr. Taylor.

32.     The communication of which was false of which Mr. Taylor denied and of which Mr.

Taylor never had the plans, intentions, means or motive to do such a thing and in light of the fact that the company never took any legitimate action as noted in the factual section to indicate that it was a legitimate and bona fide threat and the immediate contact of investigating authorities. *West v. Thomson Newspapers,* 872 P.2d 999 (Utah 1994)

33.     The damages of which are implied and of which the University would be held strictly liable for communicating such information within the University including Human Resources and other departments given the nature of the statements as noted above, however, Mr. Taylor also suffered actual damages with the loss of his employment and wages and benefits as well as his reputation among his peers and within his community and pain and suffering, anxiety, stress and depression related to the the first notice given him of the false allegations, the investigation that ensued thereafter and his ultimate termination as a result of the false allegations.

34.     It is also reasonably inferred that he was terminated because of the false allegations that were brought against him of which would create a stigma of future employment and Mr. Taylor on how he would have to explain to future employers on why the company parted ways with him.

35.     The University would also be vicariously liable for one of their employees communicating such information and creating such a claim and incorporating the claim as their own against Mr. Taylor within the course and scope of their employment for generally working and benefiting the company under their position. It can be reasonably inferred with the occupation that Mr. Taylor held, that only another fellow employee would communicate such information through discovery and as further described in the vicarious liability section. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974); *Zions First Nat. Bank v. Clark Clinic Corp.,* 762 P.2d

1090, 1094-95 (Utah 1988)

36.     Even if the allegations are not slanderous or libelous per se, given the nature and context and seriousness of the allegations, it warrants that such statements were made with actual malice or at the very least, in reckless disregard for the actual truth given the falsity of the claims as there was no bonafide or legitimate concern or articulable fact as noted in the factual section that would indicate that Mr. Taylor would do such a thing as well as Human Resources noting that the allegations were not serious to call investigating authorities. *Jacob v. Bezzant,* 2009 UT 37, 212 P.3d 535.

37.     The statements were also made in the very least negligently, in that Human Resources knew that the allegations were not serious and nor the person that made the allegations either heard the statement indirectly from a third party as Mr. Taylor has no recollection of such a claim to other employers or that the person misheard or misunderstand the context of any statement that would be remotely related to what was alleged that Mr. Taylor said. A reasonable would have first verified with Mr. Taylor directly before filing a complaint with Human Resources. Human Resources would also have thought the statements to be true if they claimed that the allegations were not serious and the statement made to IT was at least negligent given the lack of seriousness and stating that Mr. Taylor made such a claim prior to a final results of the investigation.

### B. Fraudulent Misrepresentation

38.     **Count 1:** For fraudulent misrepresentation in that a false statement was communicated that Mr. Taylor had threatened to bring guns and bombs to school through the complainant and through Human Resources. The allegations of which involved bomb and gun threats as well as

potential and future economic relations with the company and with future companies that related to Mr. Taylor's employment claiming that he had intentions to cause severe and gross harm to individuals and to their persons, life and limbs and a mass scale.

39.     The allegations of which were known to be false in that Mr. Taylor never made such a comment to other employers and in light of how WGU did not take the allegations seriously although they held out to do so. Or that the representative was made reckless in ignorance without verifying the statement or context of the statement with Mr. Taylor or a supervisor or peer prior to filing a complaint with Human Resources. The allegations of which induced the University to act which resulted in placing Mr. Taylor on administrative leave and his ultimate termination and caused him emotional distress.

40.     **Count 2:** The University incorporated the complaint as it own and communicated to Mr. Taylor the allegations against him as the basis to place Mr. Taylor on administrative leave and terminate Mr. Taylor. The University communicated to Mr. Taylor about the allegations that he had intentions to bring guns and bombs to work.

41.     Mr. Taylor had to reasonably rely on the fact that his termination was related to the allegations made against in light of the investigation, leave of absence and ultimate termination as no other explanation was given him and the allegations against him were serious. Mr. Taylor also had to reasonably rely on the fact that the University agreed with the allegations that were made against him. This is despite the fact that the University knew the allegations were not serious and were false in light of what Mr. Taylor told them and what Human Resources told IT.

42.     The action of which induced Mr. Taylor to be placed on administrative leave and be ultimately terminated.

43.     The University knew that the allegations were false in that they did not report Mr. Taylor to investigating authorities for the claims and sent a settlement agreement to Mr. Taylor guised as a severance agreement as an attempt to settle all claims against the University and told IT that the claims were not serious and that the investigating authorities didn't need to be called. With that, WGU also knew that the allegations were unfounded at the inception and the claims that a lengthy investigation was unnecessary but made it appear with Mr. Taylor that the investigation was ongoing of which Mr. Taylor relied on. Also, WGU, did not intend to actually investigate the matter. They had already determined to terminate Mr. Taylor when they contacted IT and told IT to remove Mr. Taylor from the system when the initial complaint was made. This is also in light of the fact that they never contacted or followed-up with Mr. Taylor or let Mr. Taylor know who made the complaint against him.

44.     **Count 3:** The University never revealed who actually made the complaint against Mr. Taylor, then the actual complaint was also false as there was no known identity or context regarding the actual claim and was therefore fabricated and false. The claim of which Mr. Taylor had to reasonably rely on that an actual complaint was made to induce Mr. Taylor to act. The action of which was known to be false in that there was no one actually identified who made the complaint and the company knew they did not identify any individual that made the complaint. The action of which Mr. Taylor had to rely on as why he was placed on administrative leave and ultimately terminated.

45.     **Count 3:** For also fraudulent concealment and or omission as the University omitted the results of the final investigation and terminated Mr. Taylor, indicating and inferring that he was terminated as a result of the allegations and the investigations that were unfavorable to him. This

was without further facts to indicate whether or not the allegations were true or false and without further speaking to Mr. Taylor after the initial contact with Mr. Taylor and letting him know the results of the investigation. This was also in light of WGU knowing at the inception that the allegations against Mr. Taylor were not serious and therefore unfounded which was communicated to IT. This is also in light of Mr. Taylor specifically requesting the reason for his termination. The action was to induce Mr. Taylor to make it appear that the investigation and claims were justified as to induce Mr. Taylor to rely on the termination as valid. The determination of which Mr. Taylor could only rely on the fact that he was in fact terminated for the allegations brought against him. The allegations of which caused damage to his reputation, emotional distress, and loss of employment.

46.    **Count 4:** For also fraudulently concealing to Mr. Taylor that they knew the allegations and threats were not serious and failing to communicate to Mr. Taylor that they knew the alleged threats were not serious with what the communicated to IT and failure to contact investigating authorities. The actions was intend to induce Mr. Taylor to act upon the appearance of the seriousness of the allegations to make it appear that the claims were justified and they were justified in terminating him to deter legal liability and Mr. Taylor from seeking an action against the company. Mr. Taylor had to reasonably rely on the fact and that his termination was related to the investigation coming out unfavorable to him under a serious threat made by Mr. Taylor under the circumstances surrounding the incident and the allegations give his administrative leave and ultimate termination.

47.    **Count 5:** The company also fraudulently concealed which individual from the company made the false statements against Mr. Taylor to further curtail any liability and or allow Mr.

Taylor to properly respond as to a possible ulterior motive as to why an individual would make such a claim. The action was to induce Mr. Taylor and appear that the claims and the allegations were justified and to deter him from raising a claim against the company later. Mr. Taylor had to reasonably rely on the lack of factual knowledge and conclude there was some kind of justifiable basis to have him terminated in light of the investigation.

48.     The findings and omissions of which had to be false and WGU knew it was false as no further state or investigative or prosecutorial action was made against him. This is also in light of the attempts from the University to settle the matter without further communication to Mr. Taylor when they sent him a settlement agreement. The settlement agreement was also fraudulently sent and communicated to Mr. Taylor in a way as to appear as if it was just a severance agreement but was instead to limit their liability toward Mr. Taylor without further legal action and conceal the actual final findings of the report of any future liability.

49.     **The actions of which were done by improper means,** given the falsity of the accusations, the failure to verify or corroborate claims before raising it to the attention of Mr. Taylor, the termination of Mr. Taylor for claiming that the statements were false. The attempt to "sweep" the matter away by approaching Mr. Taylor with a settlement agreement guised as a severance agreement and a confidentiality clause.

50.     The failure to apprise Mr. Taylor of the actual findings of the University and misrepresenting and omitting the results to avoid liability with Mr. Taylor that affected his future employment were also improper means. Terminating Mr. Taylor on a false claim and issues he raised as to the false claim were also improper. The University approached the situation with attempting to limit liability with Mr. Taylor with claims he had against the University and

keeping Mr. Taylor away in the dark of the accusations. The accusations of which are serious and affect the character and employability and status of an individual within a civilized community.

51.     This is also in light of the lack of actual concern to turn the case over to investigators but with actions of the termination of Mr. Taylor to infer that they held out that the claims were founded with the separation and severance agreement. This is in light of telling IT around the same time they contacted Mr. Taylor that they knew the threats were not serious and that the University did not need to be on lock-down or investigating authorities needed to be called.

52.     The actions of which were made for Mr. Taylor to rely on the fact that he was terminated for a finding that the allegations made against him were true despite him communicating to the University that the allegations were false. The actions and communication of which he could only rely on the fact that the reason why he was put on administrative leave and ultimately terminated was related to the allegations made against him. *Yazd v. Woodside Homes Corp.,* 143 P.3d 283 (Utah 2006).

53.     The omissions and allegations of which proximately caused damages to Mr. Taylor in relation to his future employment and his employment with the company reputation in the community including past and future lost wages and benefits as well as emotional harm and suffering in light of his susceptible state with the passing of his spouse.

**C. Intentional infliction of emotional distress**

54.     **Count 1:** The allegations made against Mr. Taylor and by another employee were intended or recklessly made to inflict emotional distress on Mr. Tayloe given that the allegations of which involved bomb and gun threats and that he had intentions to cause severe and gross

harm to individuals and to their persons, life and limbs and a mass scale, the allegations of which were false. The allegations of which WGU incorporated as its own against Mr. Taylor and of which Mr. Taylor had to respond to WGU with and was placed on administrative leave by WGU.

55.     Such allegations one would know would inflict emotional distress on Mr. Taylor given the seriousness of the allegations and the falsity of the claims, or the recklessly knowing given the unsubstantiated or unjustified claims would inflict emotional distress of Mr. Taylor.

56.     The actions of which are as indicated by the allegations made against him extreme and outrageous and outside the bounds of a civilized community in that a civilized community or individual would not make such false claims against Mr. Taylor that he would bring guns and bombs to work. A civilized community would not attempt to conceal and or terminate Mr. Taylor and attempt to induce him to unknowingly settle any future liability he may have as a result of the incident under the guise of a severance agreement with a confidentiality clause, the extreme and outrageous behavior is also incorporated under the cause of action and allegations under the criminal statutory violations as well as under the allegations of fraud and defamation and breach of good faith and fair dealing.

57.     **A reasonable person would have known that a false and unjustified, unsubstantiated and uncorroborated claim** that someone would bring guns and bombs to work would could emotional distress to that person given the serious allegations as it relates to criminal activity and to one's employability past and future. They would have known not to bring the matter to the attention of Mr. Taylor if they knew that the allegations were not serious. All other extreme and outrageous conduct is incorporated from count 3.

58.     **Count 2:** Human Resources and their actions and how they handled the situation,

contacting Mr. Taylor and apprising him of the allegations without proper factual context, placing Mr. Taylor on administrative leave, claiming the investigation was ongoing and cancelling his access to his employment information was an intent to cause emotional distress Mr. Taylor.

59.     This is in light of the fact of Human Resources made the pre-determined decision to terminate Mr. Taylor with the cancellation of his credentials despite knowing that the allegations were not serious and should have never apprised Mr. Taylor of the non-serious and unfounded allegations against him. However, Human Resources instead treated the situation as if it was a serious founded threat against the school and that there was a serious behind-the-scenes investigation while he was on administrative leave. The extreme and outrageous conduct of which is described in count 3.

60.     **Count 3:** The separation agreement by the company and the concealment of the investigation thereafter was also an intent or recklessly made to inflict emotional distress on Mr. Company, indicating and or inferring that the company had found just cause to terminate Mr. Taylor based on the allegations despite their knowledge that the allegations were false and not serious and fraudulently or knowingly or recklessly omitting the final outcome to Mr. Taylor.

61.     The actions of which were an attempt to cover-up the allegations made against Mr. Taylor and make the claims "go away" without further public or legal scrutiny regarding the matter instead of properly resolving the claims against Mr. Taylor and informing him of the results of the investigation.

62.     **Instead, the company left Mr. Taylor in a continued state of uncertainty which would rise to a level of high probability that such actions would cause Mr. Taylor to suffer**

**emotional distress that he was terminated claiming he intended to bring guns and bombs to work.** This also relates to knowing the uncertainty on what he would had to tell employers about the reason for his termination, what the company would tell about the reason for his termination if they were contacted and whether or not the company would file a criminal complaint with a false claim against Mr. Taylor to the investigative authorities. The agreement of which was guised as a separation agreement as an attempt to coercively and deceitfully settle all claims against Mr. Taylor and keep him from going to the investigative authorities with the confidentiality agreement.

63.     **A reasonable person would have known that such actions would cause emotional distress on an individual,** given the company made it look so that Mr. Taylor was terminated for the false and unjustified allegations made against him as well as the seriousness of the allegations against Mr. Taylor made by the individual explained in this cause of action and the facts of this complaint. A reasonable person would have known that being terminated in light of these allegations without explanation and indicating that the University accepted the allegations as true would cause emotional distress to Mr. Taylor.

64.     This is also noted in light of lack of discipline or filing a criminal complaint against the individual that made the false claims against him. **This would be considered extreme and outrageous behavior as a reasonable company** would have disciplined the individual who made the false complaint and properly corroborate the claims and accusations before bringing it to the attention of Mr. Taylor and or sending the claim to investigating authorities. Mr. Taylor also claimed that the allegations were false and Mr. Taylor would have been protected under Whistleblower protection but instead was retaliated against and terminating him in light of his

claims that were false also was extreme and outrageous conduct.

65.     This is also in light of the fact that this was not a one-time isolated incident, but that WGU has made it a pattern to hand out "separation agreements" to employees that have valid legal claims against WGU as an attempt to make the matter go away. The agreements which were specifically tailored to settle all claims with an individual in exchange for a "severance package" which included an offer of COBRA benefits that the company had to legally offer even without signing the agreement and three weeks of pay to settle all liability claims against WGU.

66.     This is also in light of the company's knowledge including the individual that made the complaint to Human Resources and or constructive and actual knowledge of the recent passing of Mr. Taylor's wife. This made Mr. Taylor more emotionally vulnerable at the time and knew that such an allegation would cause emotional distress to Mr. Taylor and placing him on administrative leave and claiming that there was a continuous ongoing investigation and not allowing Mr. Taylor to have a detailed explanation as to the allegations made against him. Such false claims also would not be made within such a community with knowledge of Mr. Taylor's emotional susceptibility with the recent passing of his wife.

67.     **The actions of which caused emotional distress to Mr. Taylor,** including the loss of his job, the worries on how such allegations could affect future job prospects as well as the worry on whether or not the information was disseminated among the other 5000 employees with the University as well as exacerbating the already known emotional susceptibility that he was suffering from with the mourning of the loss of his wife.

68.     This is also in light of the stress and anxiety of apprehension of investigative authorities, the concern about how many people at work knew about the allegations and having to live with

that stigma the rest of his life, potential criminal charges and the stress and anxiety with the termination of his employment, without knowing the actual outcome of the investigation and his ability to properly tell future employers the full story related to his separation with the company, limiting his potential ability to find future employment and all other emotional damages explained in the faction section of the complaint. *Anderson Development Company v. Tobias, et al,* 116 P.3d 323 (Utah 2005)

69.     The actions of which caused emotional distress to Mr. Taylor, including the loss of his job, the worries on how such allegations could affect future job prospects as well as the worry on whether or not the information was disseminated among the other 5000 employees with the University as well as exacerbating the already known emotional susceptibility that he was suffering from with the mourning of the loss of his wife.

70.     The actions of which caused emotional distress to Mr. Taylor in light of the allegations made against him, placing him on administrative leave, terminating him, the termination of which put Mr. Taylor in a place of uncertainty as to his future career prospects, fear of having a criminal investigation initiated against him, fear of who all knew of the allegations, fear of who made the allegations against him, fear of financial stability in light of his lost job.

### D. Intentional interference with economic relations

71.     The company intentionally interfered with an existing economic relationship Mr. Taylor had with the University through the allegations made against him as to his benefits under the contract and payment and compensation and position as well as to the legal claims and liability the University owed toward Mr. Taylor.

72.     **Count 1:** The false allegations of which involved claims that Mr. Taylor was going to

bring bombs and guns to work were meant to interfere with the economic relationship Mr Taylor had with the company as well as the benefits that stemmed from his relationship with that company. The allegations of which were false and unjustified, uncorroborated and unsubstantiated had the intent to have Mr. Taylor terminated given the serious allegations of the claims made against him as well as future companies that related to Mr. Taylor's employment claiming that he had intentions to cause severe and gross harm to individuals and to their persons, life and limbs and a mass scale.

73.    This is one of the worst and egregious allegations that one could make against an individual in this society. The allegations could only be intentional in light of their falsity and could only be improper given their severity with the intent to have Mr. Taylor terminated from his position of which actually occurred in this case. The false allegation of which was communicated to Human Resources. The allegations of which was false in that Mr. Taylor had no intentions to commit such an act and Human Resources knew the allegations weren't serious from the inception of the claim. *Anderson Dev. Co. v. Tobias,* 2005 UT 36, 116 P.3d 323

74.    **Count 2:** The company, also in failing to communicate with Mr. Taylor as to the actual results of the investigation intended never to come out with the actual outcome of the investigation of which Mr. Taylor would have to maintain to future employers that he was terminated due to the allegations made against him and infers they intended to keep it under those intentions. This is in light of the fact the company knew the allegations were not serious and false. This is in light of WGU also pre-determining to terminate Mr. Taylor without an actual bona-fide investigation. *Eldridge v. Johndrow,* 2015 UT 21, ¶ 70, 345 P.3d 553

75.    The confidentiality agreement under the settlement agreement the company made

indicates that they would not admit liability of the actions that incurred and that they were not subject to the same confidentiality as Mr. Taylor. This also infers that the company would or could still maintain that Mr. Taylor was terminated for the allegations made against them and they could communicate such to other employees but Mr. Taylor could not disclose the actual factual conditions surrounding the incident pursuant to the terms of the agreement.

76.     The actions of which were improper as it was a settlement agreement guised as a severance agreement as an attempt to limit liability that he University would have with Mr. Taylor. This was also done without telling Mr. Taylor who was unrepresented at the time to seek out an attorney before signing the agreement as well as failing to explain to him the purpose and intent of the contract. This is in light of the University also knowing that the initial allegations were false and not serious most likely before Mr. Taylor was even contacted.

77.     The means of which was to try and interfere with the liability claims that Mr. Taylor had against the company and a means to make the claims go away. The actions of making it look as if he was terminated for the allegations made against him with the omissions were also done improperly as again a means to attempt to induce Mr. Taylor to sign the agreement in fear of the University pursuing further action against him including a criminal complaint.

78.     Mr. Taylor was damaged as a result in his lost job and past and future lost wages and benefits, his loss of reputation as it relates to his career past and future and his ability to find comparable employment as well as emotional distress as explained in this complaint and other causes of action.

### E. Injurious falsehood

79.     For the false statements and allegations made against Mr. Taylor disparaging the quality

of services of Mr. Taylor and his trade and his profession and position as an employee with the University. The statements of which was related as to his propensities and intentions regarding those he worked with and the area where he worked under his position and as to the safety of employees with whom he worked as it related to claims of his intentions to bring guns and bombs to work. Mr. Taylor provided services as to helping students in the enrollment process and with financial aid and other student questions as to their enrollment with the University.

80.     The proposensities were false as it related to his propensities under his position to commit serious crimes of criminal activity at massive proportions related to the safety of life and limb of employees and business property through the use of guns and bombs and whether or not he was fit to work given his criminal propensities, plots, schemes and plans and whether or not he would in the future be held and confined in prison due to the plot and scheme. Mr. Taylor did not have such propensities.

81.     The false claims of which were communicated to at least Human Resources. The false claims were also communicated to IT from Human Resoruces. The false claims and propensities of which were thereafter communicated to Mr. Taylor by Human Resources. The basis as to the termination of Mr. Taylor was thereafter communicated throughout the University among employees thereafter. The basis of which were false as there was no performance issues that led to the termination of Mr. Taylor. The basis of performance was related to the allegations alleged against him. As a result, there was no bonafide basis for Mr. Taylor to be terminated from the company as the basis was false as it related to claims that he planned to bring guns and bombs to work. Any basis outside the allegations would be false as it was never brought to the attention of Mr. Taylor from the University.

82.     The allegations of which affects Mr. Taylor and his ability to provide services for students. With such allegations, an employer would determine Mr. Taylor not fit to provide such services give the propensities and safety to employees and students and the University. This would also apply to any employer regardless of Mr. Taylor's profession given the severity of the allegations against Mr. Taylor as it relates not only to his trade and profession, but his fitness as an individual within a civilized community. Mr. Taylor now has to explain the reason for this termination to each employer, without any justification from WGU to ensure that the allegations of which were false and creates a stigma against him each time employers ask even if he explains the allegations were false.

83.     The allegations of which would deter future employers from employing Mr. Taylor, especially in a University setting and his profession related to his career and of which ultimately led to the termination of Mr. Taylor and did actually deter future employees as he was unable to continue his work with the University. *First Sec. Bank of Utah, N.A. v. Banberry Crossing*, 780 P.2d 1253 (Utah 1989) *Restatement (Second) of Torts §§ 623A, 624, 626 (1977)*

84.     The statements of which were made with malice given the severity of the claims to terminate Mr. Taylor and or get him in trouble or suspended from the company which actually did occur to injure or vex Mr. Taylor and or were made in reckless disregard for the truth given the falsity of the claims and the lack of actual justification to make such a claim against Mr. Taylor if there was any kind of justification that an individual relied on. This is also light in knowledge that such an allegations against an individual would lead to almost certain termination. The complaint of which, the person know would result in the termination of Mr. Taylor and have a criminal investigation made against him.

85.     The statement of which Human Resources to IT was also false and knew that the statement was false, in that they claimed thereafter that the investigation was still ongoing and as a result, there could be no factual finding that Mr. Taylor threatened to bring guns to work. This is also in light of the fact that Human Resources claimed that the allegations were not serious, indicating they knew the allegations were false but made it look as if the allegations were true.

86.     This is also in light of the fact that Mr. Taylor never had such propensities and never communicated that with anyone. If there was any justification from anyone as to such a claim, it should have been verified with Mr. Taylor before making a claim to the University. Without such a verification, a person would have reasonably expect that such a claim would injury Mr. Taylor, his employment with the company and his future employment with any company in that career field and any future employment with any company which did in fact occur and damaged his economic interest in his position with WGU and career.

87.     The company, also in failing to communicate with Mr. Taylor as to the actual results of the investigation intended never to come out with the actual outcome of the investigation of which Mr. Taylor would have to maintain to future employers that he was terminated due to the allegations made against him as noted in the section for intentional interference of economic relations and was adverse to Mr. Taylor's position. *Howarth v. Ostergaard,* 515 P.2d 442 (Utah 1973).

88.     Mr. Taylor was terminated from his position as a result, was unemployed as a result and has not found a comparable position as a result and also severely undermines his ability to find a comparable position or position in any field with the same kind of salary and skills.

    **F. Violation of 18 U.S. Code § 1038**

89.    *(b)Civil Action.—Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the second sentence of section 46504, section 46505 (b)(3) or (c), section 46506 if homicide or attempted homicide is involved, or section 60123(b) of title 49 is liable in a civil action to any party incurring expenses incident to any emergency or investigative response to that conduct, for those expenses.*

90.    **Count 1.** Agents of WGU engaged in conduct with the intent to convey false or misleading information as it related to the allegations of Mr. Taylor of bringing guns and bombs to work. The individual that made the initial complaint had the intent to convey false or misleading information as explained in the fraud section with count 1 and under the defamation section count 1. The individual conveyed misleading information to Human Resources as Mr. Taylor never had such intentions to commit such actions at work.

91.    **Count 2.** WGU through Human Resources conveyed false and misleading information to IT claiming that Mr. Taylor did in fact have such intentions to commit the actions prior to their claimed conclusion of the investigation. The actions of which were intentional in that Human Resources knew that the allegations were not serious and that he could not be found factually culpable prior to the completion of their investigation.

92.    **Count 3.** WGU, through Human Resources intended to convey false and misleading information when they withheld the factual details of the complaint including the individual that

made the complaint from Mr. Taylor in regards to the allegations made against Mr. Taylor. The information was misleading without a factual description on who made the complaint, when the incident occurred and the context of what was said. They also held out for the allegations against Mr. Taylor to be serious, whereas in reality, Human Resources did not take the allegations seriously which they told IT. They did not call the police and did not intend to. They did not place the University on lockdown. The conveyance of misleading information did not allow Mr. Taylor to be able to know who would have made such a comment and to allow him to make a proper response to the allegations.

93.    **Count 4.** WGU also intended to convey and conveyed false and misleading information to Mr. Taylor during the pendency of the investigation, holding out to still be investigating the matter and holding out to claim that the allegations were still serious. The actions of which were false and misleading in that WGU did not actually take the matter seriously as describe in count 3. WGU had also predetermined to terminate Mr. Taylor when the initial complaint was made when they contacted IT instead of wait for the conclusion of any investigation. They also failed to conduct a serious investigation which included an intensive follow-up interview with Mr. Taylor and or actually contact investigating officials. The allegations of which and the seriousness as to the allegations that WGU held them out as put Mr. Taylor under the impression that authorities would be contacted. The motive of which was at least in part cover-up the fact that a serious claim against Mr. Taylor was actually false.

94.    **Count 5.** WGU intended to convey and conveyed false and misleading information with the omission of the final investigation results. Instead of telling Mr. Taylor of the final results, they instead told him they were sending him a "separation agreement" guised as a settlement

agreement. Indicating and inferring, and misleading Mr. Taylor was terminated based on a upholding of the allegations made against him. They also misled Mr. Taylor when they failed to tell him the basis for his termination when he requested such to Human Resources. The action of which was also in part to defraud Mr. Taylor to sign the separation agreement and any civil and legal claims he may have had against the company and keep him from discussing the matter further. The actions of which also put Mr. Taylor in continued fear on whether or not investigating authorities would ever contact him.

95.     The actions of which caused Mr. Taylor to incur expenses to incident the investigative response, namely, the loss of his position, his inability to continue work when he was placed on administrative leave, wages and benefits, attorney fees as well as loss of reputation, emotional distress and other consequential damages described herein.

96.     *18 U.S. Code Chapter 113B § 2332f - Bombings of places of public use, government facilities, public transportation systems and infrastructure facilities (a)Offenses.— (1)In general.—Whoever unlawfully delivers, places, discharges, or detonates an <u>explosive</u> or <u>other lethal device</u> in, into, or against a place of public use, a <u>state or government facility</u>, a <u>public transportation system</u>, or an infrastructure facility—(A) with the intent to cause death or <u>serious bodily injury</u>, or (B) with the intent to cause extensive destruction of such a place, facility, or system, where such destruction results in or is likely to result in major economic loss, shall be punished as prescribed in subsection (c). (2)Attempts and conspiracies.— Whoever attempts or conspires to commit an <u>offense</u> under paragraph (1) shall be punished as prescribed in subsection (c).*

97.     The false information and misleading information against Mr. Taylor dealt with the allegations and claims of Mr. Taylor and his intent to deliver, place, discharge, detonate an explosive or "bomb" at WGU with the intent to cause serious death or bodily injury evidenced with the other claim that he also intended to bring guns to the facility as well as his intent to cause extensive destruction to the facility. The place of which is for public use as a University and employees and the building of which is also infrastructure facility with its actual location. to WGU and its facilities that would likely result in a major economic loss to WGU its facilities and its employees with the death and destruction to its premises with the use of an explosive device. This also related to the false claim of Mr. Taylor and his attempt to commit mass homicide to individuals.

98.     *18 U.S. Code § 2332a - Use of weapons of mass destruction Chapter 113B* **(a)Offense Against a National of the United States or Within the United States.—***A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction* **(2)***against any person or property within the United States, and* **(B)** *such property is used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce;* **(C)** *any perpetrator travels in or causes another to travel in interstate or foreign commerce in furtherance of the offense; or weapon of mass destruction*

99.     **(2)the term "weapon of mass destruction" means—** *(A)any destructive device as defined in section 921 of this title; (B)any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors;*

100.   **18 U.S. Code § 921(4)***The term "destructive device" means—**(A)***any explosive, incendiary, or poison gas—**(i)** bomb, **(ii)** grenade, **(iii)** rocket having a propellant charge of more than four ounces, **(iv)** missile having an explosive or incendiary charge of more than one-quarter ounce,**(v)** mine, or **(vi)** device similar to any of the devices described in the preceding clauses;*

101.   The false or misleading information also dealt with a claim that Mr. Taylor threatened or attempted to use a weapon of mass destruction against WGU and its employees within the United States with the threat of bringing bombs to work. WGU as a university nationwide, is also a corporation that affects interstate commerce, the company of which is involved in interstate commerce with its students many of whom are from state outside the state of Utah. The company of which also deals with other vendors and contractors as well as with the federal government for student assistance loans as well as other federal subsidies

102.   *18 U.S. Code § 922 (2)(A) of Chapter 44 It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.*

103.   **(3)(A)***Except as provided in subparagraph (B), it shall be unlawful for any person, knowingly or with reckless disregard for the safety of another, to discharge or attempt to discharge a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the person knows is a school zone.*

104.    The false and misleading information claimed that Mr. Taylor attempted to discharge a firearm that he knew to be a school zone with WGU and its grounds defined as a private school University.

### H. Violation of Utah Code Section 76-9-105

105.    *76-9-105 Making a false alarm -- Penalties. (1) A person is guilty of making a false alarm if he initiates or circulates a report or warning of any fire, impending bombing, or other crime or catastrophe, knowing that the report or warning is false or baseless and is likely to cause evacuation of any building, place of assembly, or facility of public transport, to cause public inconvenience or alarm or action of any sort by any official or volunteer agency organized to deal with emergencies. (2) (a) A person is guilty of a second degree felony if the person makes a false alarm relating to a weapon of mass destruction as defined in Section 76-10-401.*

106.    *76-10-401 6) (a) "Weapon of mass destruction" means: (i) any item or instrumentality that is designed or intended to cause widespread death or serious bodily injury to multiple victims.*

107.    *(3) In addition to any other penalty authorized by law, a court shall order any person convicted of a felony violation of this section to reimburse any federal, state, or local unit of government, or any private business, organization, individual, or entity for all expenses and losses incurred in responding to the violation, unless the court states on the record the reasons why the court finds the reimbursement would be inappropriate.*

108.    **Count 1.** The individual, acting as agent for WGU, made a false alarm and intialte and circulate a report or warning knowing when the report was made to Human Resources of an

impending bombing, crime or catastrophe. The alarm of which was the claim that Mr. Taylor had intended to brings guns and bombs to work. The complaint of which to Human Resources knew would likely cause an evacuation or to cause public inconvenience or alarm or action of any sort by any official to deal with emergencies given the seriousness of the allegations. The individual of which knew that such warning was false or baseless as described in the defamation cause of action count 1 as well as the fraud cause of action count 1. This is also in light of the fact that Human Resources did not take the claim seriously with the communication to IT.

109.    **Count 2.** Human Resources acting as an agent for WGU, made a false alarm to IT of an impending catastrophe, knowing that the report or warning was false or baseless noting that the action was not serious. The communication of which caused a public inconvenience or alarm to the IT department and the rest of WGU that was placed under security thereafter and likely to cause an action of a official to deal with emergencies.

110.    **Count 3.** Human Resources acting as an agent for WGU, made a false alarm to Mr. Taylor of an impending bombing crime or catastrophe that he had planned to initiate. Knowing that the warning was false or baseless given the communication they had with IT. And such a warning could cause an evacuation of the building where Mr. Taylor worked given the seriousness of the allegations and cause a public inconvenience or alarm by an official organized to deal with emergencies.

111.    **Count 4:** Human Resources acting as an agent for WGU, made a false alarm to Mr. Taylor of an impending bombing crime or catastrophe holding out that and claiming that the allegations were still serious and as if Mr. Taylor still had the intent and propensity to commit such a crime. The alarm of which could be likely to cause an evacaulation to the University with

such a propensity. The actions of which included placing him on administrative leave and his

ultimate termination and failure to notify Mr. Taylor the final finding of the claims and their

actual perception of the seriousness of the claims. They omissions of which made it hold out as if

emergency officials would still deal with the situation and would likely cause public

inconvenience or alarm to the school at large with the claim that Mr. Taylor actually and still had

such propensities.

112.     The actions of which caused Mr. Taylor to incur expenses to incident the investigative

response, namely, the loss of his position, his inability to continue work when he was placed on

administrative leave, wages and benefits, attorney fees as well as loss of reputation, emotional

distress and other consequential damages described herein.

### I. Statutory recklessness and general recklessness

113.     **Statutory recklessness**

114.     The actions described under the state and federal violations also amounted to statutory

liability, in that that the actions described above were intentional or in reckless disregard with a

high-probability that such false claims would result in injury toward Mr. Taylor which would

render WGU strictly liable.

115.     The statutes and their purpose of which are designed to prevent the type of harm that Mr.

Taylor suffered, namely, the false alarm of the use of weapons and bombs in a school zone

described under the statute given the serious nature of the allegations and stigma it produces and

the concern of placing a false fear and anxiety and chaos with the public at large holding the

false allegations made against Mr. Taylor negligence per se as a violation of a public duty.

116.   WGU is liable for making a false alarm as explained under the Utah statute under all counts.

117.   WGU is liable for making a false alarm as explained under the federal statute for each count and for each false claim that was made or three false claims per count as it relates to the use of a weapon of a mass destruction, bombings of places and facilities, and the attempted use of a firearm in a school-zone.

118.   The duties of which were breached when such false and misleading information was circulated and conveyed of which WGU should be held strictly liable for violation of such statutes which were made recklessly or intentionally and was the proximate cause of Mr. Taylor's injuries described below.

119.   **General Recklessness**

120.   A reasonable person would have verified the seriousness of the allegations before making a false claim to Human Resources with a supervisor, co-employee or Mr. Taylor or based on the context or how the information was communicated to them. A reasonable person in Human Resources would have also verified the seriousness of the allegations and talked to other individuals before apprising Mr. Taylor of the claims and placing him on administrative leave based on the content of the speech, who was reporting the information, the character and known propensities of Mr. Taylor as well as before contacting IT.

121.   A reasonable person would not have contacted and apprised IT and Mr. Taylor if they knew the threats were not serious and impliedly false and not finding the threats serious enough to contact police officials. A reasonable person would not have said that Mr .Taylor was in fact guilty of the the claims and the claims were substantiated to IT if they held out to have an

ongoing investigation. A reasonable person would not have held out to continue to claim the allegations and threats were serious claiming that the investigation was ongoing, knowing that they were not serious and or that the threats were false and the information provided was false or misleading. A reasonable person would not have held out to terminate Mr. Taylor without explanation of the investigation, continuing to tell him there was an on-going investigation and left him without knowing the final results with allegations that seriously affect his character, career and future.

122.    A reasonable person would have attempted to mitigate the damages and claims Mr. Taylor may have had toward the University with a retraction from the individual and Human Resources, discipling the individual of the false claim or properly explaining to Mr. Taylor the circumstances and details of the allegations. A reasonable person would not have terminated Mr. Taylor in wake of the false allegations if they knew the allegations were false and had no reflection on Mr. Taylor and his work performance. A reasonable person would not have sent Mr. Taylor a separation agreement with a confidentiality provision in an attempt which was in actuality a settlement agreement of all claims Mr. Taylor had against the company at that time to attempt to make the issue "go away."

123.    The duties of which were breached when the false claims were made against Mr. Taylor without proper verification prior to Human Resources, for the actions made against Mr. Taylor and holding out for the claims to be serious when in reality they knew they were not. The actions of which were done intentionally as explained in the claims of fraud, intentional interference with economic relations and intentional infliction of emotional distress as well as under the malice section of defamation and the statutory violations. Or the actions of which were done in

reckless disregard for the truth without the proper verification process by the individual and knowing that the allegations were not serious through Human Resources but still held to be. The actions of which had a substantial probability that injury would occur to Mr. Taylor for reporting a false claim with serious allegations attached related to weapons of mass destruction and mass bodily death and or injury, injuries of which include his reputation, his emotional state as well as his profession and position wages and benefits.

124.    The actions of which proximately caused injury to Mr. Taylor, in that Mr. Taylor suffered emotional distress, damages to his reputation as covered under the defamation section, lost wages and benefits as well as other consequential damages related to his lost profession including monthly recurring expenses and utilities and his ability to find the same profession and position with a comparable salary as well as all other damages explained in the damages section.

**J. Breach of good faith and fair dealing / Wrongful Termination / Retaliation / Breach of Contract**

125.    Mr. Taylor would also have a cause of action under breach of good faith and fair dealing in breaching the implied in fact covenant under Utah Contracts not to interfere with an individual's right to benefits from the fruits and rights under the contract, including interfering with that right in violation of public policy.

126.    Here, the company intentionally interfere with the employment contract of Mr. Taylor when they terminated him based on a false claim and supporting a false claim of one of the most egregious criminal claims that could be made against an individual as well as the whistleblower claims described above. *Tomlinson v. NCR Corp.,* 2014 UT 55.

127.    The University took such drastic actions and attempted to sweep this matter under the rug and attempt to settle every single plausibly related civil cause of action that Mr. Taylor would

have against the company.

128.    They company should have instead conducted a neutral investigation and apprize Mr. Taylor of the investigation of the unfounded accusations and allow him to keep his employment or terminate him based on founded claims without a severance of which he had a right to under the investigation that was conducted. The attempt to unlawfully try and waive Mr. Taylor's legal remedies 8 days after the incident and without apprising him any specific details is also a breach of good faith and fair dealing and in violation of public policy.

129.    The investigation of which, did not actually occur, in that Mr. Taylor was never contacted thereafter, WGU had already pre-determined to terminate Mr. Taylor and factually determine that he had threatened to bring guns to work, despite their knowing the non-seriousness of the allegations and that the claim was false when they talked to Mr. Taylor. WGU of which nonetheless held out to Mr. Taylor that the claims were being taken seriously and that there was an ongoing investigation and ultimately a finding of liability and terminating in wake of the allegations. Mr. Taylor had the right not to be terminated if the investigation was unfounded.

130.    Mr. Taylor was also unlawfully terminated in violation of public policy when he reported a false claim of an impending bombing and retaliated against for claiming that the claim was false and for further criminal violations related to how the matter was conducted as noted in this complaint.

131.    Mr. Taylor was also unlawfully terminated in violation of public policy for the intentional and malicious actions described in these causes of action that interfered with Mr. Taylor's right to obtain and enjoy employment whenever possible with the false allegations made against him that defamed his character and good name and reputation as it relates to his employability and

enjoying already obtained employment with his position under Article XII Section 19 of the Utah Constitution through an agent, servant or employee who made the false allegations and the allegations of which the company incorporated as their own and terminated Mr. Taylor in light of the allegations made against him.

132.    Mr. Taylor was also unlawfully terminated in violation of public policy in light of the criminal violations that occurred in this action explained in statutory violation claims.

### a. Further violations under University policy that would amount to a breach of good faith and fair dealing.

133.    *5080 Employee Conduct and Work Rules Fighting with or threatening employees or non-employees; Possession of guns, explosives, or other weapons on University property unless otherwise required by applicable law;Any intentional or negligent act which endangers the safety, health, or well-being of another person; Misconduct or any act which disrupts work or discredits the organization;*

134.    *5150 Safety Observing the University ban on possession of deadly weapons on University premises including any vehicle in the parking lot, unless otherwise required by applicable law.*

135.    *5190 Weapon Free Workplace It is a violation of our safety policy to possess a weapon in the workplace, except when an employee, who is legally permitted to possess a firearm, stores the firearm in a vehicle in the company parking lot (unless otherwise required by applicable law). The firearm must not be in plain view, and the container or unoccupied vehicle must be locked. This weapons ban includes non-security employees legally licensed to carry weapons. Employees will leave all weapons including knives, mace, tasers, and similar items in their vehicles. Employees will not stalk, harass, or assault their co-workers, students, or customers. Employees who violate this policy will be subject to immediate discipline up to and including*

*termination.*

136.    *5200 Workplace Violence Conduct that threatens, intimidates, or coerces another employee, a customer, or a member of the public will not be tolerated.*

137.    Here, it appears the applicable policies as noted above were the basis for the termination of Mr. Taylor the allegations of which were false and the results of the investigation were not divulged as to the results of the investigation, and he had a right to know whether or not there was a finding of violation of those specific policies prior to termination for cause. Also, the false allegations was workplace violence that threatened and intimidated Mr. Taylor. The actions of Human Resources of supporting the false claims and holding out for them to be serious was also coercive and intimidating as well as the withholding of information and holding out that the claim was valid with the separation agreement. The separation agreement was also intimidating and coercive given the fact that Mr. Taylor had just been terminated and would be in need of some kind of income, incentivizing him to sign the severance agreement to waive all legal claims he may have against WGU. It was also deceptive when Human Resources claimed that it was a "separation agreement" which included a confidentiality clause. This was also without telling Mr. Taylor who unrepresented, to seek counsel before signing the agreement.

138.    *5200 Workplace Violence WGU will promptly and thoroughly investigate all reports of threats of (or actual) violence and of suspicion individuals or activities. The identity of the WGU individual making a report will be protected as much as is practical. In order to maintain workplace safety and the integrity of its investigation, WGU may suspend employees, either with or without pay, pending investigation Anyone determined to be responsible for threats of (or actual) violence or other conduct that is in violation of these guidelines will be subject to prompt*

*disciplinary action up to and including termination of employment.*

139.   Here, under the policy it notes that if anyone is determined to be in violation of workplace violence, would be subject to disciplinary action including termination of employment. In that Mr. Taylor was terminated from employment and banned from the premises, it indicates that the University made such a finding. However, there was no notice to Mr. Taylor as to the final results of the investigation.

140.   *5220 Whistle-Blower Policy Any University employee with reasonable suspicion of illegal or improper activity should report such activity to their manager or supervisor, or the Vice President of Human Resources.*

141.   Here, given that Mr. Taylor claimed that the allegations was false, was protected under whistle-blower policy and could not be terminated if the claims were false.

142.   *Consequences of Making a False Report A report made under this policy can have considerable impact on the personal and professional lives of those charged, both during the investigation and long term. An employee shall not intentionally misuse this policy by reporting frivolous claims, by using this policy to redress personal grievances or personnel disputes, or by making false, malicious or misleading statements. Any employee who is believed to have intentionally misused this Whistle-Blower Policy will be subject to discipline up to and including termination.*

143.   *2090 Harassment and Retaliation Protection Against Retaliation WGU prohibits retaliation against an individual who makes a complaint, opposes action in violation of this policy, reports a possible violation of this policy or participates in any investigation or proceedings related to any such complaint. Retaliation can take many forms and may include*

*more formal job actions (e.g. termination, discipline, demotion, denial of pay or promotions) and less formal job actions (duty or shift changes, verbal abuse), which materially deter someone from engaging in activity protected by the law, such as making a complaint.*

144.   *An employee who believes that he/she has been subjected to conduct violating this policy or who has questions regarding this policy is strongly encouraged to immediately contact his/her supervisor. If the person responsible for the conduct is your direct supervisor, or if you are uncomfortable speaking with your direct supervisor about the conduct, you should immediately contact the Human Resources Manager, or any other member of management. WGU will investigate questions and complaints promptly and as confidentially as possible under the circumstances.*

145.   *Employees should feel free to raise their concerns or make complaints without fear of retaliation.*

146.   Mr. Taylor was subject to harassment and retaliation for reporting a false claim that was made against him and for being a subject of the investigation when he was termination of which he reported to Human Resources as he denied the allegations. It appears the company violates its own terms of allowing and helping an individual file a false complaint and retaliate against Mr. Taylor as a result of the false complaint. Mr. Taylor was under whistle-blower protection as well for the claim of a false complaint and could not be retaliated against including termination until the final results of the investigation.

147.   WGU created a pattern were if employees made legal claims to WGU, they were given a severance agreement, disuasing individuals from raising concerns or making complaints in fear of retaliation. This is also in light of the actual purpose of Human Resources and its

investigations as noted to deter liability toward the University, instead of actually investigating and properly resolving claims and complaints.

148.    The way Human Resources conducted the complaint also harassed Mr. Taylor given their holding out for the claims to be serious but knowing that the claims were not serious and claiming to have an ongoing investigation and holding out that he was terminated for cause in support of the complaint that was made against him.

149.    Also Mr. Taylor was falsely accused of and falsely terminated under University violation. The investigation department promised protections under the policy violates Mr. Taylor's right to benefit from those protections under this policy. If the University claims that they are not subject to their own policies and guidelines, this is also a clear indication of a violation of good faith and fair dealing as Mr. Taylor had a right to reasonably rely on these policies and procedures in this situation.

150.    Mr. Taylor also incorporates the criminal violations noted in this complaint for further violations and breaches under public policy.

151.    As a result, Mr. Taylor has suffered from lost wages and benefits and future loss wages and benefits as well as out-pocket costs and expenses but-for the wrongful termination / breach as well as emotional distress and damages to his reputation.

### L. Vicarious liability

152.    The employee that made the complaint against Mr. Taylor regarding his intention to inflict mass destruction and bodily harm upon individuals was acting within the course and scope of his or her employment when they made the complaint as an employee to Human Resources. The complaint was made for the company or at least in part as it relates to reporting serious

criminal misconduct as to its employees and the safety of its employees. The action of which was authorized by the company which allows employees to make complaints to Human Resources as it relates to workplace misconduct. WGU also expects its employees to report workplace misconduct to them.

153.    The purpose of the complaint was at least in part, to apprise WGU of an employee that had intentions to interfere with the safety of its employees. The purpose of the complaint was to have the WGU investigate Mr. Taylor and further their interest of ensuring that all of their employees, the business itself and its property and potential liabilities that could arise from such a threat were protected.

154.    The individual also could have plauisbly had some kind of justification to apprise WGU of the concern even if such justification was reckless or negligent. If there was such a justification, then it could also be inferred that the failure to report the claim based on such a justification would not be in furtherance of WGU's objectives as it relates to employee safety and its property. WGU also authorized and approved of the complaint, inferring that the complaint was made by an individual that WGU recognized as an employee that could make such an complaint. The complaint of which was made and commonly done by other employees when a complaint is made and within those authorized limits to make such a complaint as all employees are authorized to make complaints to WGU of workplace misconduct. Employees are authorized to make complaints of workplace conduct as to their personal knowledge as to apprise the company of workplace misconduct. The complaints of which are in furtherance of the company's objectives in resolving and ensuring that workplace misconduct is not allowed. This

is also in light of the type of misconduct that was reported that affects the company and its image and existence on a massive level.

155.    WGU also authorized and approved of the allegations and incorporated it as their own through Human Resources and filed a formal complaint against Mr. Taylor in light of the allegations that were made against him when they contacted Mr. Taylor and placed him on administrative leave. They also authorized and approved of the statements and allegations that were made regarding Mr. Taylor as they also acted on those statements and ultimately terminated Mr. Taylor based on the allegations made against him and incorporated it as the company's factual determination as to terminate Mr. Taylor. The company also held out to support, defend, acknowledge, incorporate the allegations made the individual as their own even if the individual was not an actual employee of the company and as if the allegations were made against Mr. Taylor by the company and not a person in their individual capacity.

156.    If the complaint was made by an individual in their personal capacity, the actions of WGU would not have occurred as they would not have incorporated the allegations as their own against Mr. Taylor. WGU would not have initiated action against Mr. Taylor and would not have placed him on administrative leave and would not have ultimately terminated him. Also, given that he was placed on administrative leave, it indicates that the allegations were related to Mr. Taylor's performance and contract with WGU as an employee that ultimately affected the contract. If the contract was not employee related and the allegations, WGU would not have incorporated the allegations and complaint against Mr. Taylor. The complaint could have only been purely on an individual basis if WGU had not become involved. Instead it was as it related to Mr. Taylor's employment. The fact that WGU did initiate action, also indicates that the

individual that made the complaint acted with apparent authority as to the ability to apprise WGU and authorized to apprise WGU as to its employees and their workplace performance related to WGU's objectives to evaluating their employees based on their performance and conduct and specifically as it related to Mr. Taylor and his work performance.

157.    This indicates that the company believed that accepting the statements as true or making it to look like the statements were true in terminating Mr. Taylor was in furtherance of the company's objectives. The complaint could not be purely personal as only an employee could make a complaint to Human Resources and had to be on behalf of the company.  If it was purely personal it could have only made in another way, of which could not have been through human resources. Since the complaint was made to Human Resources, there could have been no deviation and have no relation to employment. *Birkner v. Salt Lake County,* 771 P.2d 1053 (1989)*( citing W. Keeton, Prosser and Keeton on the Law of Torts § 70, at 502 (5th ed. 1984)(See also FN 2)).*

158.    In that the individuals that conducted the investigation, that prepared the settlement agreement, that ultimately terminated Mr. Taylor were also acting within the course and scope of their employment under their investigative and managerial duties or with apparent authority to do so as a means to benefit the company generally under those duties in investigating and terminating individuals for cause. The purpose and intent of which was to investigate and resolve human employment complaints and relations to ensure the safety of its employees and determine whether or not an employee should be disciplined, or should no longer with the company to ensure that the company has the personal they want to work for the company and if they are fit to work for the company based on performance and conduct.

159.   **Or that the person that made the complaint acted with apparent authority** as an individual that worked with or for the University that had the ability to make such a complaint to Human Resources. WGU consented to the actions of the complaint made to Human Resources. Mr. Taylor only interacted with employees on his floor and so it can be inferred that only an individual that knew of or somehow interacted with Mr. Taylor could make a complaint that was another employee of WGU.

160.   If WGU had not consented and authorized the complaint as to the claims not being founded or as to the claims not being work-related then they would not have contacted Mr. Taylor. They also would not have terminated Mr. Taylor if they were not related to his employment. Given how the company treated the complaint, a reasonable person would have believed that WGU consented or permitted the employee's conduct at the time of the conduct.

161.   Mr. Taylor also had a believe that given how WGU contacted them and the reliance that WGU took on the complaint, that the individual that made the complaint had the authority to act and make a complaint against Mr. Taylor.

162.   Only an employee that worked with Mr. Taylor would have apprised WGU to authorize the action and take the claim seriously. WGU also authorized the acts with the termination of Mr. Taylor to make it appear that the allegations were founded. WGU also authorized the acts as it appears that the individual that made the complaint was not disciplined or reprimanded or reported to investigating authorities for making the complaint. *Burdick v. Horner Townsend & Kent, Inc.,* 2015 UT 8.

163.   **WGU as the principal is liable for the physical harm caused by the actions described herein in that WGU exerted so much control over the manner** through their investigation

with Human Resources, to determine if the claims were true or false, to determine whether or not

an actual investigation should be conducted against Mr. Taylor and if he should be placed on

administrative leave as the claims were related to the safety and well-being of employees and the

University which led to the ultimate termination of Mr. Taylor. WGU had the ability to

determine how serious the allegations were and what remedial efforts and investigative efforts

needed to be made. The control of which and manner of which had so much control over Mr.

Taylor and part of the work performed by Mr. Taylor and the allegations made against him

which caused such injury that the individual that made the complaint could not have carried out

the work and caused such damage in his own way. The individual, in their own way could have

only confronted Mr. Taylor regarding the allegations. They did not have the power or authority

to place Mr. Taylor on administrative leave, give him a settlement agreement, terminate him,

investigate the claims and make any remedial actions as to the individual that made the

allegations. *Mallory v. Brigham Young University,* 2012 UT App 242.

164.    Also, WGU was the bad actor and the beneficiary and not merely a paissive enterprise

that was manipulated by others in that they benefited from the settlement agreement, the

investigation results and or the purpose and intent was to benefit WGU and limit liability owed

toward WGU with the actions of Human Resources. Also, WGU was the beneficiary of the

original complaint that was made regarding one of its employees to apprise WGU of one of its

employees. The complaint of which WGU incorporated as its own complaint against Mr. Taylor

with the official complaint that was made against him and the conclusions that were made by

Human Resources to IT.

165.    All causes of actions as it relates to the conduct of WGU, its employees, agents, officers, servants, are incorporated into this claim to show vicarious liability toward WGU.

166.

### IV.    Damages

167.    Given the seriousness of the allegations against Mr. Taylor and the company's attempt to silence them instead of address them and properly investigate and remedy the situation and allow Mr. Taylor's image to go further tarnished, the damages are also serious. If the allegations were true and Mr. Taylor attempted to obtain a similar or any occupation including one that offered minimum wage, the chances of him obtaining such a job would be seriously undermined.

168.    With that, but for the allegations made against Mr. Taylor and if they were true, he would most likely not obtain a similar occupation or any occupation for the rest of his professional career. That would indicate that the damages to his reputation as to his occupation would be the amount he was earning with WGU to the average age of retirement. Mr. Taylor made $56,403.20 a year with benefits and that would amount to $1,353,672.00 with benefits factored in if he had the same salary at retirement. With an increase in promotion and salary it would be $3,653,672.00

169.    Also, this stigma would stay with Mr. Taylor the rest of his life and would damage him up to the average life expectancy of a U.S. male in the community. Which would be $3,400,000.00 valued at damages to one's reputation in the community at $100,000.00 a year and a total of $7,053,672.00 in actual damages past and future. *Knickerbocker v. Cannon,* 912 P.2d 969, 982 (Utah 1996); *Cohn v. J. C. Penney Co.,* 537 P.2d 306 (Utah 1975); *Gibbs M. Smith, Inc. v. United States Fid. & Guar. Co.,* 949 P.2d 337 (Utah 1997)

170.    Mr. Taylor would also have claim to special damages to the past and future pain and suffering from the extreme stigma made toward him regarding his occupation and the allegations made against him and how such a stigma would affects one's occupation and career, employability, advancement as well as the emotional trauma he has suffered from as explained in the factual section of the complaint.

171.    Given that Mr. Taylor just suffered the death of his wife last year, the company was on notice of the heightened emotional vulnerability Mr. Taylor was in at the time when the allegations were made against him. The damages of which would be at least four times the amount of actual damages or a minimum of $28,214,688.00 or a total of $35,268,360.00 of actual and special damages. *Atkin Wright & Miles v. Mountain States Telephone & Telegraph Co., et al.,* 709 P.2d 330, 336 (Utah 1985).

172.    Mr. Taylor also suffered actual damages, lost wages and benefits past and future with the company but for the actions claimed herein mitigated by any future position he obtains through his good-faith efforts, the efforts of which are also in light of the loss of his wife that had already occurred and his emotional vulnerability at that time as explained in the loss to his reputation career.

173.    Mr. Taylor also suffered consequential damages, including payments to utilities, rent, and other necessities, the payments of which had to be taken from other financial sources instead of his wages through the University.

174.    Mr. Taylor also seeks lost interest as to what he should have been afforded.

175.    Mr. Taylor also seeks that Defendant pay for any tax hits that Mr. Taylor may incur for obtaining any lump judgment amount for wages and claims that extend beyond a claim of one year.

### A.    Punitive damages.

176.    Mr. Taylor would also have claim to punitive damages under slander per se and other intentional torts which should be at least three times the amount of actual damages. Here, the company should be penalized for their wilful and wanton disregard to Mr. Taylor, his reputation past and future and his future professional career the actions of which were done intentionally or recklessly as explained in each cause of action or incorporated from other cause of action. This is in light of the fact that the company knew or should have known the personal emotional trauma he already suffers and suffered prior to this incident. To dump this on him and handle the investigation the way it did and thereafter terminate him and offer him less than a months salary for his troubles on unfounded unimaginable charges and help the complainant conceal the allegations further demonstrates the wilful and wanton disregard for human life and the company's ability to know the difference between right and wrong.

177.    This as a result, would require such a penalty fee in this case to penalize the company for what they have done to Mr. Taylor, his life, his reputation, his career with the company and in the future and to deter the company from allowing this from happening in the future. It is apparent with the investigation and the settlement agreement that this was a planned-out, calculated, paid and executed plan of action involving Human Resources, the VP of people and talent and almost undoubtedly, the advice and drafts from legal counsel that required time and effort and focus on this matter especially in the light of the fact that this was couched as a

settlement agreement and not a severance agreement and that it touched on every plausible cause of action he would have in this matter as well as any unknown causes of action and it not a typical severance agreement an employee would sign while departing from a company. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.* 532 U.S. 424, 440-42 (2001)

178.    This also indicates that this is a typical business practice within the company regarding these types of issues and again a penalty fee would be warranted to deter any such future business practices from occurring. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 426 (2003)

179.    In light of that, the settlement agreement the University drafted indicates they understand the seriousness of these claims and possible claims Mr. Taylor may have against the University. However, how the company has attempted to settle this matter with Mr. Taylor indicates they were not really serious to make this matter right as already indicated with hopes that this matter would just go away and handed him the agreement without telling him to consult with an attorney prior.

180.    This includes one of the worst stigmas imaginable comparing him to individuals that reside in Guantanamo and with unwanted nicknames that do not fade from memory. This is also in relation to one of the hottest topics of nation-wide public concern that has been such a year and nine months into the start of this century. The allegations of which if true or false would make Mr. Taylor a public, unwanted nation-wide and world-wide household name until the day he died.

**WHEREFORE,** Mr. Taylor respectfully prays that this court will grant the following relief in light of what is described in this verified complaint:

181.    A factual and legal finding against the Defendant under the facts and law outlined in this

complaint.

182.    That a jury try be impaneled to make such a legal and factual determination at the time of

trial.

183.    For damages including interest as described in this complaint.

184.    All other relief this court would deem proper in the administration of justice.

Respectfully submitted this 27th day of November, 2018

/s/ Brian K. Jackson

_____

Brian K. Jackson
Brian K. Jackson, LLC
Attorney for Richard Taylor