ROBERT O. RICE (6639)
JASCHA K. CLARK (16019)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone:  (801) 532-1500
Facsimile:  (801) 532-7543
rrice@rqn.com
jclark@rqn.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RICHARD TAYLOR,<br><br>              Plaintiff,<br><br>       v.<br><br>WESTERN GOVERNORS UNIVERSITY, a Utah Corporation,<br><br>              Defendant. | **DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**<br><br>Case No. 2:18-CV-00780-RJS-DBP<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Western Governors University ("WGU"), by and through its counsel of record, hereby respectfully submits this Motion to Dismiss the Amended Complaint [Dkt No. 17] filed by Plaintiff Richard Taylor ("Plaintiff").

## INTRODUCTION

When WGU ended Plaintiff's employment following its investigation of a report that he made threatening remarks in the workplace, Plaintiff filed his original complaint, alleging claims of assault and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

WGU moved to dismiss those ill-conceived claims, and all others, including the slander claim that seems to represent Plaintiff's chief concern.  Rather than defend that motion, Plaintiff filed an Amended Complaint, replacing the RICO and assault claims with one under the Stop Terrorism and Military Hoaxes Act and, for good measure, a few other ill-defined claims.  In amending, however, Plaintiff managed to further confound the alleged slander that forms the so-called basis of his $35 million lawsuit.  For example, Plaintiff now advances at least eight variations of the alleged slander, making it impossible to determine what was allegedly said, to whom, and in what context it was said – allegations that are essential to any slander claim.

What is clear, however, is that each of his claims fails under Rule 12, beginning with Plaintiff's claim under the Stop Terrorism and Military Hoaxes Act (the "Terrorism Hoax Act"), enacted after the World Trade Center attacks to provide a remedy for first responders responding to false alarms about terrorist acts.  Plaintiff's slander claim fails under Rule 8 and the sheer weight of Plaintiff's varied and unintelligible allegations, and because Plaintiff cannot show WGU's vicarious liability for the alleged slander.  His remaining claims – and there are a dozen more – fail for the reasons stated below.  While dismissal of Plaintiff's claim under the Terrorism Hoax Act will strip the Court of jurisdiction over Plaintiff's claims, the Court should exercise the discretion available to it to dispense with the balance of Plaintiff's preposterous claims.  Hence, WGU respectfully urges the Court to grant its motion to dismiss in its entirety.

### PLAINTIFF'S ALLEGATIONS IN THE AMENDED COMPLAINT[1]

1. WGU is a private university.  (Am. Compl. ¶ 2.)

2. Plaintiff worked at WGU's branch location in Salt Lake City, Utah.  (*Id.,* ¶ 7.)

3. On or about July 10, 2018, "an employee or coworker" slandered Plaintiff when

---

[1] The following allegations are taken from Plaintiff's Amended Complaint and are set forth only for purposes of this motion.  WGU neither admits nor denies the allegations.

someone registered an "internal[]" complaint about Plaintiff that WGU's human resource office

subsequently investigated.  (*Id.*, ¶¶ 7, 8, 10, 13, 29.)

4.   The Amended Complaint characterizes the alleged slander in assorted ways, ranging

from an allegation that an unnamed employee said Plaintiff "threatened" gun violence, to an

allegation that someone said Plaintiff "attempted to use a weapon of mass destruction against

WGU," to an allegation that Plaintiff was defamed when an unnamed person announced that he

"attempted to discharge a firearm" at the university.  (*Id.*, ¶¶ 8, 10, 101, 104, 108, 155.)

5.   Specifically, the Amended Complaint provides at least eight variations of what

Plaintiff considers to be the slander, as set forth below:[2]

- "Mr. Taylor called the Human Resources Department thereafter and talked to Tracy
  Miller who told him that somebody came to them and told them that Mr. Taylor had
  threatened to bring guns and bombs into the office."  (*Id.*, ¶ 8.)

- "Around this time, Crystal contacted IT (Information Technology) and told IT to cancel
  to credentials and access for Mr. Taylor.  Crystal also told IT that the reason being,
  noting that Mr. Taylor had stated he would bring guns to work.  IT asked if the school
  needed to be put on lockdown or if the police needed to be contacted and Crystal
  responded in the negative and noted that it wasn't serious."  (*Id.*, ¶ 10.)

- "The false information and misleading information against Mr. Taylor dealt with the
  allegations and claims of Mr. Taylor and his intent to deliver, place, discharge, detonate,
  an explosive or "bomb" at WGU with the intent to cause serious death or bodily injury
  evidenced with the other claim that he also intended to bring guns to the facility as well
  as his intent to cause extensive destruction to the facility."  (*Id.*, ¶ 97.)

- "The false or misleading information also dealt with a claim that Mr. Taylor threatened or
  attempted to use a weapon of mass destruction against WGU and its employees within
  the United States with the threat of bringing bombs to work."  (*Id.*, ¶ 101.)

- "The false and misleading information claimed that Mr. Taylor attempted to discharge a
  firearm that he knew to be a school zone with WGU and its ground defined as a private
  school University."  (*Id.*, ¶ 104.)

---

[2] The following allegations are set forth here without alteration.

- "The individual, acting as agent for WGU, made a false alarm and intialte [sic] and circulate a report or warning knowing when the report was made to Human Resources of an impending bombing, crime or catastrophe."  (*Id.*, ¶ 108.)

- "Human Resources acting as an agent for WGU, made a false alarm to Mr. Taylor of an impending bombing crime or catastrophe holding out that claiming that the allegations were still serious and as if Mr. Taylor still had the intent to and propensity to commit such a crime."  (*Id.* at 111.)

- WGU also authorized and approved of the allegations and incorporated it as their own through Human Resources and filed a formal complaint against Mr. Taylor in light of the allegations that were made against him when they contacted Mr. Taylor and placed him on administrative leave."  (*Id.*, ¶ 155.)

6. Eight days later, at the conclusion of the investigation by the human resources office, WGU terminated Plaintiff's employment, on July 18, 2018.  (*Id.,* ¶¶ 16-17.)

7. Later that same day, WGU offered Plaintiff a severance payment in conjunction with a severance agreement, entitled "Settlement Agreement and Release" ("Severance Agreement") (*Id.,* ¶ 19; *see also* Severance Agreement, attached hereto as Exhibit 1.)[3]

8. The Severance Agreement explicitly stated that "[n]othing in this Agreement shall be construed to prohibit [Plaintiff] from reporting conduct to, providing truthful information to, or participating in any investigation or proceeding conducted by, any federal, state, or local government agency."  (*Id.*, § 6.)

9. Plaintiff declined to sign the Severance Agreement.  Instead, he filed the instant matter, naming only WGU as a defendant.  (Am. Compl. ¶ 2.)

10. Based on the allegations set forth above, Plaintiff alleges he suffered $35 million in damages (exclusive of punitive damages) under the following causes of action:  (1) violation of the federal Stop Terrorism and Military Hoaxes Act, (2) violation of Utah Code section 76-91-

---

[3] When considering a motion to dismiss, the court may review the contents of the complaint, as well as documents referenced in the complaint that are central to the plaintiff's claim, without converting the motion into one for summary judgment.  *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013).

05, (3) defamation (4) injurious falsehood, (5) "statutory recklessness," (6) "general recklessness," (7) fraudulent misrepresentation, (8) intentional infliction of emotional distress, (9) intentional interference with economic relations, (10) breach of contract, (11) breach of the covenant of good faith and fair dealing, (12) wrongful discharge,  and (13) retaliation.  (*Id.*, ¶¶ 29, 38, 54, 71, 79, 89, 105, 113, 119, 125, 133, 171.)

11.    Plaintiff alleges that WGU is vicariously liable for Plaintiff's alleged injuries resulting from WGU's conduct.  (*Id.,* ¶ 152.)

### STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must provide "enough facts to state a claim to relief that is plausible on its face," which requires "more than an unadorned, the-defendant-unlawfully harmed-me accusation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original).

While a court generally must treat allegations as true, that is not the case for legal or factual conclusions.  *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).  "[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) (citation omitted).  "[A] plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC*, 656 F.3d at 1214.

A district court has discretion to decide pendant state-law claims even where an existing federal claim that would otherwise afford federal question jurisdiction fails. *Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995).  In evaluating whether to exercise such supplemental jurisdiction, courts consider the extent to which "judicial economy, convenience, and fairness would be served by retaining jurisdiction." *Martinez v. Sw. Cheese Co., LLC*, 618 F. App'x 349, 355 (10th Cir. 2015).  Further, "[a] federal court justifiably may retain jurisdiction of the pendent claims when substantial time and energy have been expended on the case prior to the disposition of the federal claims." *Anglemyer*, 58 F.3d at 541.  Here, WGU respectfully requests that the Court exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss all claims addressed herein to preserve judicial resources and avoid prejudice to WGU.

## ARGUMENT

I.   **PLAINTIFF HAS FAILED TO ADEQUATELY PLEAD A VIOLATION OF THE FEDERAL STOP TERRORISM AND MILITARY HOAXES ACT AND ITS STATE COUNTERPART, UTAH CODE SECTION 76-9-105.**

### A.  Plaintiff Fails to State a Claim Under the Terrorism Hoax Act.

Having recognized the obvious failings of his federal RICO claim, Plaintiff tries his hand asserting an equally-ridiculous claim under 18 U.S.C. section 1038(b), known as the Stop Terrorism and Military Hoaxes Act of 2004. *United States v. Brahm*, 520 F. Supp. 2d 619, 622 (D.N.J. 2007) (discussing criminal violation of the Terrorism Hoax Act under 18 U.S.C. section 1038(a).)  The Terrorism Hoax Act is "designed to prevent and punish phony bomb threats and other such hoaxes where no real threat existed, but law enforcement time and effort would be needlessly (and intentionally) sidetracked into looking for nonexistent weapons and fictitious imminent threats." *Id*. at 626 (citing H.R. Rep. No. 108-505, at 4 (2004).  The need for the statute became apparent following the World Trade Center terrorist attack.  "Because of the

tragic September 11, 2001 attacks and the October, 2001 anthrax attacks, the public remains

alarmed and is appropriately reporting suspicious activity.  After the anthrax attacks in the fall of

2001, H.R. 3209, the "Anti-Hoax Terrorism Act of 2001," was introduced to addresses a

growing phenomena of hoaxes that further terrorized the American public into falsely thinking

biological attacks had occurred."  H.R. Rep. No. 108-505, at 4 (2004).

The Terrorism Hoax Act has two components, a provision defining "criminal

violation[s]" and a provision providing for a "civil action."  The criminal provision provides

penalties for conveying "false or misleading information," (colloquially, raising "false alarms")

about various criminal activities like bombing aircraft and detonating nuclear and biological

weapons.  18 U.S.C. § 1038(a).  The civil provision provides civil action for similar "false

alarms" that trigger expensive emergency and investigative responses from governmental and

non-profit agencies and first responders.  18 U.S.C. §§ 1038(b) and (c).[4]  Plaintiff somehow

contends he has a civil action under the Terrorism Hoax Act because someone "conveyed

misleading information to Human Resources," and "Human Resources conveyed false and

misleading information to IT . . . ."  (Am. Compl. ¶¶ 90-91.)

What Plaintiff fails to recognize, however, is that the Terrorism Hoax Act's civil action

provision "acts only as an additional layer of enforcement against those who violate 18 U.S.C.

---

[4] The full text of 18 U.S.C. section 1038(b) states as follows:

> Whoever engages in any conduct with intent to convey false or misleading information under
> circumstances where such information may reasonably be believed and where such information indicates
> that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10,
> 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284),
> or section 46502, the second sentence of section 46504, section 46505 (b)(3) or (c), section 46506 if
> homicide or attempted homicide is involved, or section 60123(b) of title 49 is liable in a civil action to any
> party incurring expenses incident to any emergency or investigative response to that conduct, for those
> expenses.

18 U.S.C. § 1038(b).

section 1038(a)(1), and is not intended to represent a stand-alone cause of action." *Mackall v. United States Dep't of Def.,* No. CV RDB-17-0774, 2017 WL 5564665, at *6 (D. Md. Nov. 20, 2017), *aff'd,* 721 F. App'x 303 (4th Cir. 2018) (involving employee defamation claim against employer) (citing *Manuel v. United States*, 78 Fed. Cl. 31, 35 (Fed. Cl. 2007); *see also Johnson v. Working Am., Inc.*, No. 1:12 CV 1505, 2012 WL 3074775, at *3 (N.D. Ohio July 30, 2012) (Terrorism Hoax Act "does not represent an independent civil cause of action for which a private citizen may file a complaint."). There is no allegation that WGU violated section 1038(a) and Plaintiff has no standing to assert such a claim. *Crotts v. Gunnison Valley Bank*, No. 2:11-CV-1113 CW, 2012 WL 681791, at *3 (D. Utah Feb. 29, 2012) ("Plaintiffs have no standing to institute a federal criminal prosecution and no power to enforce a criminal statute.") (citation omitted). Obviously, then, plaintiff cannot proceed with an independent civil claim under section 1038(b).

In addition, a civil action under the Terrorism Hoax Act requires the plaintiff to have "incurred expenses incident to any emergency or investigative response" triggered by the alleged false alarm. 18 U.S.C. § 1038(b). A responsible defendant shall "reimburse any state or local government, or private not-for-profit organization that provides fire or rescue service incurring expenses incident to any emergency or investigative response to that conduct, for those expenses." 18 U.S.C. § 1038(c).[5] Clearly, the remedies under the Terrorism Hoax Act are restricted to emergency and investigative expenses incurred not by private parties, but by state

---

[5] Plaintiff seeks recovery of "expenses" under subsection (b) of the Terrorism Hoax Act, while the act's description of reimbursable "expenses" appears under subsection (c) of the statute. Under rules of statutory construction, it is appropriate to look to subsection (c) to interpret the "expenses" available under subsection (b). *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (holding that "identical words used in different parts of the same act are intended to have the same meaning.") (citation omitted); *see also Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (citation omitted).

and local agencies, first responders, and non-profit organizations caught up in the aftermath of a false alarm.  As such, Plaintiff is not entitled to the relief under the Terrorism Hoax Act.

Stated differently, Plaintiff does not fall within the "zone of interest" created by the Terrorism Hoax Act, and thus is not entitled to proceed.  The zone of interest test "asks whether a particular federal cause of action 'encompasses a particular plaintiff's claim.'"  *In re Peeples*, 880 F.3d 1207, 1213 (10th Cir. 2018) (quoting *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014); *see also United States v. Wells*, 873 F.3d 1241, 1261 (10th Cir. 2017) ("[T]he question that courts have *misguidedly* used the term 'standing' to describe . . . is really whether a particular litigant is a member of a class that Congress has authorized to sue . . . .") (emphasis in original).  To answer this question, "we presume that a statute ordinarily provides a cause of action 'only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.'"  *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017) (quoting *Lexmark*, 572 U.S. at 129); *see also Lexmark*, 572 U.S. at 129 ("Congress is presumed to 'legislat[e] against the background of' the zone-of-interests limitation, 'which applies unless it is expressly negated.'"  (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997)).

Here, Plaintiff's claim does not fall within the zone of interest of the Terrorism Hoax Act. The statute was enacted in the wake of the September 11 attacks and is plainly designed to criminalize bona fide false alarms and provide relief to state and local law enforcement and non-profit first responders.  No statutory language, no legislative history, and no case law suggests that in enacting the statute Congress intended to protect private plaintiffs.  *See Manuel*, 78 Fed. Cl. at 35 ("Plaintiff has provided the court with no indication that he qualifies to receive the monetary relief that the [the Terrorism Hoax Act] provides . . . .").  Because Plaintiff does not

fall within the Terrorism Hoax Act's zone of interest, dismissal of his claims under 18 U.S.C. § 1038(b) must follow.[6]

### B.  Violation of Utah Code Section 76-9-105.

Uninhibited by his misapplication of the Terrorism Hoax Act, Plaintiff also asserts a claim under its counterpart in the Utah criminal code, Utah Code section 76-9-105.  That criminal statute provides felony-level penalties for making certain "false alarm[s]," and allows courts to order "any person convicted" of a statutory violation to reimburse those who incurred corresponding expenses.  Utah Code § 76-9-105(1)-(3).  The statute provides no civil remedy and restricts orders of reimbursement only to those criminally convicted of violating the statute. *See id.*  "When a statute makes certain acts unlawful and provides criminal penalties for such acts, but does not specifically provide for a private right of action, [courts] generally will not create such a private right of action."  *Harvey v. Ute Indian Tribe of Uintah & Ouray Reservation*, 2017 UT 75, ¶ 73 (quoting *Youren v. Tintic Sch. Dist.*, 2004 UT App 33, ¶ 4, *cert. denied*, 94 P.3d 929 (Utah 2004).)  Because section 76-9-105 provides no private right of action, the Court must dismiss this claim.

## II.     THE COURT SHOULD DISMISS PLAINTIFF'S DEFAMATION CLAIM.

### A.  Plaintiff's Defamation Claim Fails Under Rule 8.

"To state a claim for defamation, [a plaintiff] must show that defendants published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage."  *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah

---

[6] The Amended Complaint contains errant and random references to various other federal criminal statutes like 18 U.S.C. section 113B (regarding killing a U.S. National) and 18 U.S.C. section 2332f (regarding bombing places of public use). Plaintiff never explains these sensational but nonsensical references.  In any event these statutes do not provide private rights of action, and Plaintiff has not pled any.

1994).  Plaintiff's first pleading task, then, is to identify the defamatory words spoken.  *See id*. Whether a statement is capable of sustaining a defamatory meaning is a question of law.  *Id*. at 1008.  "In deciding whether a statement is capable of sustaining a defamatory meaning, "the guiding principle is the statement's tendency to injure in the eyes of its audience" when viewed in the context in which it was made."  *Mast v. Overson*, 971 P.2d 928, 932 (Utah Ct. App. 1998) (affirming summary judgment dismissal of defamation claim).

Plaintiff has failed to plead the existence of a statement capable of defamatory meaning under the strictures of Federal Rule of Civil Procedure 8.  *See* Fed. R. Civ. P. 8 (requiring "short and plain statement of claim.").  "Rule 8 serves the important purpose of requiring plaintiffs to state their claims intelligibly so as to inform the defendants of the legal claims being asserted."  *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007).  "Scholars have noted that, in spite of Rule 8's standard, 'the standard for successfully pleading defamation tends to be more stringent than that applicable to most other substantive claims because of the historically unfavored nature of this type of action, the First Amendment implications of many of these cases, and the desire to discourage what some believe to be all too frequently vexatious litigation.'"  *Royal Pac. Ltd. v. Faith Elec. Manufacture Co., Ltd*, 322 F. Supp. 3d 1178, 1184 (D.N.M. 2018) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1245 (3d ed.)).  Thus, in a defamation claim, when applying Rule 8 "'the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context[.]'"  *Id*. at 1184-85 (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008)).  Applying this principal, the Tenth Circuit dismissed under Rule 12 a defamation complaint that failed to plead sufficient "facts concerning time, place, actors, or conduct to enable defendants to respond."  *Pike v. City of Mission, Kansas*, 731 F.2d 655, 661

(10th Cir. 1984) (overruled on other grounds as stated in *Baker v. Board of Regents*, 991 F.2d 628, 633 (10th Cir. 1993)).  Similarly, the Tenth Circuit held under Rule 8 that a defamation claim must provide "sufficient notice of the communications complained of to allow [the defendant] to defend itself."  *McGeorge v. Cont'l Airlines, Inc.*, 871 F.2d 952, 955 (10th Cir. 1989).

Plaintiff's muddled Amended Complaint makes it impossible to identify just what defamatory words were spoken, and the all-important context in which the alleged slander occurred.  Is it that someone said that Plaintiff "had threatened to bring guns and bombs into the office?"  (Am. Compl. ¶ 8.)  Or is it that someone reported that Taylor attempted to actually "discharge a firearm that he knew to be a school zone [sic]?"  (*Id.*, ¶ 104.)  Did "Crystal" tell the IT Department that it should secure Taylor's email during an investigation of a claim that Taylor "had stated he would bring guns to work?"  (*Id.*, ¶ 10.)  Or was Crystal the one who filed a "formal complaint" about Taylor, and if so, with whom was the complaint filed and what was the context in which the formal complaint was officially filed?  (*Id.*, ¶ 155.)  Is the issue that Taylor was said to have made mere threats, or was it actually said that Taylor announced he "inten[ded] to deliver, place, discharge, detonate, an explosive or 'bomb' at WGU with the intent to cause serious death or bodily injury . . . ?"  (*Compare id.*, ¶ 8 *with id.*, ¶ 97.)

In short, Plaintiff's Amended Complaint is so scrambled with regard to what words were spoken, and to whom and in what context they were spoken, that the "time, place, actors, or conduct" is indecipherable, leaving WGU unable to defend itself.  *Pike*, 731 F.2d at 661; *McGeorge*, 871 F.2d at 955.  Meeting Rule 8's requirements is especially important in a defamation claim where Plaintiff must allege the nature of the words spoken, the context in which they were spoken, and the audience to whom the slander was spoken.  *Mast*, 971 P.2d at

932.  WGU must know whether it must defend a claim that human resources made a "formal complaint" about a bombing spree, or a claim that "Crystal" simply advised the IT department to secure Plaintiff's email account while it investigated a complaint that Plaintiff made threatening remarks.  *See Rangel v. Am. Med. Response W.*, No. 1:09-CV-01467-AWI, 2013 WL 1785907, at *16 (E.D. Cal. Apr. 25, 2013) (rejecting defamation claim where alleged defamatory remark was published "internally . . . solely for the purpose of reporting and investigating [plaintiff's] alleged misconduct.").[7]

The Amended Complaint offers no such clarity, instead resorting to confusing, ever-changing and fantastical characterizations of the alleged slander.  Accordingly, Plaintiff's defamation claim fails under Rule 8 and dismissal should follow.  *See Harty v. United States*, 354 F. App'x 375, 376 (10th Cir. 2009) (citations omitted) (affirming dismissal of complaint that district court found "so incomprehensible as to be implausible.").

### B.  Plaintiff has not Adequately Pled Publication.

Plaintiff has failed to properly plead his claim for defamation because he has not adequately pled the required element of publication, inasmuch as the allegedly defamatory remark was published within the confines of WGU during a workplace investigation.  While the Amended Complaint never clearly pleads the exact words spoken or the context in which the alleged slander was made, it is clear that whatever was said was communicated only internally at WGU.  Thus, the alleged defamation was published in an "intracorporate" setting.  There is a "general exemption to the publication rule for corporate communications to necessary third parties authorized to act on behalf of the corporation."  *Gray v. AT&T Corp.*, 357 F.3d 763, 766-67 (8th Cir. 2004) (involving allegedly defamatory statements made to human resources

---

[7]  *Rangle* involved a discussion of the common interest privilege, but nonetheless provides guidance regarding the importance of context and audience in a defamation analysis.

department).  The Tenth Circuit, applying Oklahoma law, embraced the exception, holding that

an "intracorporate communication" does not constitute a publication for purposes of establishing

a defamation claim.  *Starr v. Pearle Vision,* 54 F.3d 1548, 1553 (10th Cir. 1995) ("For a

corporation, therefore, acting through one of its agents or representatives, to send a libelous

communication to another of its agents or representatives, cannot be a publication or the libel on

the part of the corporation. It is but communicating with itself.") (citation omitted).[8]

  The Utah Supreme Court has not determined whether this exception applies in Utah.

And admittedly, this court has suggested that it does not.  *See Howcroft v. Mountain States*

*Telephone and Telegraph Company,* 712 F.Supp. 1514, 1522-23 (D. Utah 1989) ("the Court

believes that Utah would follow the" rule that "there can be . . . 'publication' of communications

between agents of the same corporation").  WGU, however, proposes a narrow application of the

exception.  In fact, if ever there were circumstances to which the exception might apply, those

circumstances are present in Plaintiff's Amended Complaint.  Specifically, Plaintiff goes to great

lengths, in an attempt to show vicarious liability, to show that the alleged defamatory statements

were made in the context of a human resource investigation.  Thus, to apply the intracorporate

exception here is to apply it only to the narrow context of an internal investigation conducted in

the regular course of business.  *See Cummings v. Valley Health Sys., LLC*, 705 F. App'x 529, 531

(9th Cir. 2017) ("The intracorporate communication privilege applies to a statement involving

the regular course of the corporation's business, if the statement is made in good faith to a person

with an interest in the subject matter of the statement.") (internal quotation marks omitted);

---

[8] *See also Dixon v. Economy Co.* 477 So.2d 353, 354 (Ala. 1985) (applying intracorporate nonpublication rule);
*Williams v. Cook,* 192 Ga. App. 811, 811-12 (1989) (same); *Cangelosi v. Schwegmann Bros., Etc.,* 390 So.2d 196,
198 (La. 1980) (same); *Lovelace v. Long John Silver's, Inc.,* 841 S.W.2d 682, 684 (Mo.App. 1992) (same);
*Magnolia Petroleum Co. v. Davidson,* 194 Okla. 115, 148 P.2d 468, 471 (1944) (same); *Woods v. Helmi,* 758
S.W.2d 219, 223 (Tenn. Ct. App. 1988) (same); *Flynn v. Reinke,* 199 Wis. 124, 225 N.W. 742, 744 (1929).

*Hayes v. Wal-Mart Stores, Inc.*, 953 F. Supp. 1334, 1340 (M.D. Ala. 1996) (holding that "communications among the managerial personnel of a corporation about the company's business do not constitute a publication.") (citing *Dixon v. Economy Co.*, 477 So.2d 353, 354 (Ala. 1985).  Under these narrow circumstances, the Court should apply the intracorporate publication exception here.  Absent publication, then, Plaintiff's defamation claim fails at the *prima facie* stage and dismissal must follow.

### C.  Plaintiff has not Pled a Sustainable Vicarious Liability Theory of Recovery.

Plaintiff alleges that he is entitled to recover from WGU on a vicarious liability theory. (Am. Compl. ¶ 152.)  Utah recognizes that "an employer can be vicariously liable for the tortious acts of employees under the theory of respondeat superior if those acts are conducted within the scope of employment."  *Clark v. Pangan*, 2000 UT 37, ¶ 8 (considering certified question regarding test for determining whether assault was in course of employment).  Thus, the question here is whether the alleged slander (and other alleged tortious acts) was committed by a WGU employee in the scope of the employee's employment.

There are "three basic criteria for determining whether an employee's conduct lies within the scope of employment. These three criteria are that the employee's conduct must (1) 'be of the general kind the employee is employed to perform,' (2) 'occur within the hours of the employee's work and the ordinary spatial boundaries of the employment,' *and* (3) 'be motivated, at least in part, by the purpose of serving the employer's interest.'"  *Id.*, ¶ 20 (quoting *Birkner v. Salt Lake County*, 771 P.2d 1057 (Utah 1989) (finding no vicarious liability)) (emphasis added). Plaintiff's Amended Complaint does not satisfy the first and third elements required to successfully plead WGU's vicarious liability with respect to any of Plaintiff's asserted tort claims, as set forth below.

As an initial matter, Plaintiff's failure to plead his defamation claim in compliance with Rule 8 is also fatal to his claim for vicarious liability. In short, because the Amended Complaint fails to plainly plead the defamatory words spoken, to whom they were spoken, and the context in which they were spoken, it cannot be discerned whether the alleged slander was made in the course of anyone's employment. *See* Fed. R. Civ. P. 8. Nonetheless, the Amended Complaint does reveal that Plaintiff was allegedly slandered during the course of an "internal" investigation. (Am. Compl. ¶ 13.) No Utah court has addressed the question of whether an employee's allegedly defamatory remarks in the course of an internal human resources investigation constitutes conduct in the scope of employment. However, those courts that have considered this issue uniformly conclude that it does not.

For example, in *Crouch v. J C Penney Corp.*, 337 F. App'x 399 (5th Cir. 2009), the Fifth Circuit considered a defamation claim virtually identical to Plaintiff's. In *Crouch*, the plaintiff alleged he was defamed when an employee falsely reported to a human resources investigator that the plaintiff engaged in threatening behavior and made violent remarks. The plaintiff denied he made threats or violent comments, but the false report nonetheless led to the plaintiff's termination. *Id*. at 401. The plaintiff then sued, arguing the employer was vicariously liable for its employee's defamatory statements because the employee lied during a workplace investigation, which the plaintiff argued was within the employee's scope of employment. The Fifth Circuit rejected the plaintiff's vicarious liability theory, however, holding that when an employer requires or allows "employees to discuss other employees in the course of workplace misconduct investigations, such discussions are not in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." *Id*. at 402-403 (internal quotation marks omitted).

The Fifth Circuit based its holding – that the employer was not vicariously liable for its employee's defamatory statements made in an internal investigation – on a careful analysis of *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573 (Tex. 2002). *Minyard* strikes directly at the heart of Plaintiff's case here, inasmuch as it answers the question "whether an employee who defames another employee to his employer during a workplace misconduct investigation was acting within the course and scope of his employment." *Id.* at 574. In *Minyard*, the plaintiff alleged he was defamed by a co-worker, who lied during an internal investigation conducted by a district manager. *Id.* at 575. In rejecting the plaintiff's claim for vicarious liability, *Minyard* held that:

> We conclude there is no evidence to show that [co-worker]'s defaming [plaintiff] during the investigation were made in the course and scope of [co-worker]'s employment with [employer]. While we agree the evidence demonstrates that [employer]'s policies require employees to participate in workplace misconduct investigations—just as [co-worker] did here—these policies do not demonstrate that [co-worker]'s defaming [plaintiff] to [district manager] during the investigation would further [employer]'s business and accomplish a purpose of [co-worker]'s job. *There is a critical distinction between defaming someone to one's employer and defaming someone for one's employer.*

*Id.* at 579 (emphasis added) (citations omitted).[9]

*Minyard's* conclusion is consistent with Utah's vicarious liability rules. For example, in *Birkner*, the Utah Supreme Court required the plaintiff to demonstrate that an employee who sexually assaulted the plaintiff did so in the scope of his employment. 771 P.2d at 1056. Thus, the Utah Supreme Court, applying the same test required by *Minyard*, found no vicarious

---

[9] *Minyard* was decided on summary judgment, but its holding is equally applicable under Rule 12, inasmuch as Plaintiff's entire vicarious liability theory in the instant matter is based on his assertion that he was defamed during the course of an internal investigation. (Am. Compl. ¶¶ 94-96.) *Minyard* establishes, as a matter of law that such a theory is legally insufficient to establish WGU's liability here.

liability because the sexual assault "was not the general kind of activity a therapist is hired to perform." *Id*. at 1058.

This is not to say that an employer can never be held vicariously liable for defamatory remarks by an employee.[10] But to plead a successful vicarious liability claim, the plaintiff must aver that the "employee's purpose or intent, however misguided in its means, must be to further the employer's business interests." *Id.* at 1057. On this point "[t]here is a critical distinction between defaming someone *to* one's employer and defaming someone *for* one's employer." *Minyard,* 80 S.W.3d at 579 (emphasis added). Plaintiff alleges only that he was defamed *to* WGU. (Am. Compl. ¶ 16.) There is no allegation that Plaintiff was defamed *for* WGU. Thus, it cannot be said, as is required by Utah law before there can be vicarious liability, that the unnamed employee's "purpose or intent" was "to further [WGU's] business interests." *Birkner*, 771 P.2d at 1057.

Policy reasons abound for not making WGU vicariously liable for the alleged defamation of an employee under the circumstances presented by Plaintiff's Amended Complaint. Making WGU liable for the random, unauthorized comments of its employees would force the university to monitor the idle comments of its literally thousands of employees in every circumstance.[11] "It would hardly be possible for an employer to successfully police all employee interactions and thereby ensure that employee conversation never crosses decorous lines." *Garnett v. Remedi Seniorcare of Virginia, LLC*, 892 F.3d 140, 144 (4th Cir. 2018) (rejecting vicarious liability defamation claim under Rule 12(b)(6)). "There are literally millions of verbal workplace interactions, some of which may, unfortunately, be quite offensive. But to hold that such

---

[10] To the contrary, *Birkner* recognizes that an employer may be held liable for the defamatory remarks of its employees. *Id.* at 1057, n.2.

[11] Plaintiff alleges that WGU employs 5,000 employees. (Am. Compl. ¶ 67.)

statements invariably give rise to vicarious liability admits of no limiting principle." *Id*. Further, making employers liable for comments made during workplace investigations would have a chilling effect on employers' need to maintain a safe and healthy work environment. "The law thus abounds with instances where respondeat superior is tempered but without eliminating the obligation on employers to make reasonable efforts to improve the workplace environment and head off deleterious conduct." *Id*. Thus, if a plaintiff is not required to plead vicarious liability with more than is present here, then every employer who meets its statutory obligation to investigate unlawful harassment or discrimination, proceeds under the threat of having to litigate a defamation claim for merely fulfilling its statutory duty. *See id*. (observing that Title VII of the Civil Rights Act of 1964 requires employers to investigate workplace complaints of discrimination). The law should not prevent employers from taking action aimed at "curbing harmful workplace conduct and boosting employee morale." *Id*. at 145.

Not surprisingly then, courts routinely find that an employee's defamatory statement made in the course of a workplace investigation does not give rise to vicarious liability. *See Smith v. Tr. Co. Bank*, 215 Ga. App. 413, 416 (1994) ("[t]he doctrine of respondeat superior does not apply in slander cases, and a corporation is not liable for the slanderous utterances of an agent acting within the scope of his employment, unless it affirmatively appears that the agent was expressly directed or authorized to slander the plaintiff.") (citation omitted); *Garnett*, 892 F.3d at 146 (holding under Rule 12(b)(6) that employee's "comments, though beyond tasteless, did not fall within the scope of his employment. As a result, [defendant employer] cannot be held vicariously responsible."); *Hoff v. Walco Int'l, Inc.*, No. 03:11-CV-00623-LRH, 2013 WL 275298, at *2 (D. Nev. Jan. 23, 2013) ("[W]orkplace misconduct complaints do not give rise to respondeat superior liability.") (citing *Minyard*, *supra*).

19

In sum, Plaintiff's vicarious liability claim fails because he has not pled that he was defamed by a WGU employee acting in the scope of employment. Having failed that pleading requirement, Plaintiff has failed to state a claim for which relief can be granted with respect to WGU's vicarious liability for slander.

## III. PLAINTIFF FAILS TO STATE A CLAIM FOR INJURIOUS FALSEHOOD.

Plaintiff's injurious falsehood claim also fails under Rule 8 and because Plaintiff has failed to adequately plead that WGU is vicariously liable for the statements that form the basis of Plaintiff's injurious falsehood claim. *See supra*, pp. 12-20.

Even if this were not the case, this claim fails at the *prima facie* level. Under Utah law, injurious falsehood combines the two related torts of slander of title and trade libel. *See Jack B. Parson Companies v. Nield*, 751 P.2d 1131, 1134 (Utah 1988). To establish a claim for injurious falsehood, Plaintiff "must prove falsity of the statements made, malice, and special damages." *Direct Imp. Buyers Ass'n v. KSL, Inc.*, 538 P.2d 1040, 1042 (Utah 1975), *overruled on other grounds in later appeal sub nom. Direct Imp. Buyer's Ass'n v. K. S. L., Inc.*, 572 P.2d 692 (Utah 1977).

Simply put, Plaintiff's allegations cannot be crammed into this cause of action. As to the first element, "although some courts have interpreted the tort more broadly, to be actionable under Utah law, the false statements must either disparage plaintiff's title or the quality of plaintiff's product." *IHC Health Servs. Inc. v. ELAP Servs., LLC*, No. 2:17-CV-01245-JNP-EJF, 2018 WL 4688358, at *7 (D. Utah Sept. 28, 2018). Clearly, WGU has not slandered Plaintiff's title and there is no allegation that any product of Plaintiff was slandered.

The second element, malice, "may either be implied in law or be affirmatively proven by the plaintiff." *Nield*, 751 P.2d at 1134. Affirmative proof "requires a showing that the wrong

was done with the intent to injure, vex, or annoy." *Id.* To be implied in law, a plaintiff must establish that "a party knowingly and wrongfully records or publishes something which is spurious or untrue, or which gives a false or misleading impression, adverse to another's title, under such circumstances that he should reasonably foresee might result in damage to the property owner." *Howarth v. Ostergaard*, 30 Utah 2d 183, 185 (1973). As established above, the alleged false statements were not the subject of an actionable publication because they were made in an intracorporate setting. *See supra*, p. 13. Without more, this element of Plaintiff's injurious falsehood claim remains unsatisfied.

Finally, to sustain his injurious falsehood claim Plaintiff must allege special damages. *Direct Imp. Buyer's Ass'n*, 572 P.2d at 694. The damages must specifically relate to the economic harm caused by the disparagement of title, product, or business. *Watkins v. Gen. Refractories Co.*, 805 F. Supp. 911, 917 (D. Utah 1992). And, those damages "must be specifically stated" pursuant to Rule 9(g) of the Federal Rules of Civil Procedure. *IHC Health Servs. Inc.*, 2018 WL 4688358, at *7. Plaintiff has failed to allege any specific economic harm that he has suffered, let alone pleaded it in a manner sufficient to meet Rule 9's heightened pleading standard. *Watkins*, 805 F. Supp. at 917 (dismissing injurious falsehood claim because plaintiff "fail[ed] to articulate any economic interest which has been harmed other than his alleged loss of employment."). Accordingly, Plaintiff's injurious falsehood claim should also be dismissed.

## IV.    THERE IS NO RECOGNIZED CLAIM FOR STATUTORY OR GENERAL RECKLESSNESS.

Plaintiff asserts that WGU is guilty of "statutory recklessness" and bears "statutory liability" for its reckless conduct, without citing an actual statute that defines the alleged

recklessness or gives rise to the alleged liability.  (Am. Compl. ¶¶ 113-18.)  There can hardly be a claim for statutory recklessness without a supporting statue and hence, dismissal must follow.  Plaintiff goes on to allege that WGU is guilty of general recklessness, dedicating more than two pages of allegations to this nebulous claim.  (*Id.*, ¶¶ 119-24.)  Undersigned counsel has found no authority recognizing a claim for general recklessness under Utah law.  Additionally, Plaintiff alleges that as a result of WGU's general recklessness, he suffered emotional distress.  (*Id.*, ¶ 124.)  The exclusive remedy for such a workplace injury, however, is Utah's Workers' Compensation Act.  Utah Code § 34A–2–105(1); *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 22 ("Workers may not sue their employers for injuries caused by on-the-job accidents.  The exclusive remedy for work-related accidents is the workers' compensation scheme, which was created by the legislature to distribute benefits to injured workers.").  Hence, the Court must dismiss these so-called claims.

## V.   PLAINTIFF FAILS TO STATE A CLAIM FOR FRAUDULENT MISREPRESENTATION.

### A.  Plaintiff's Fraud Claim Fails under Rule 9(b).

In an apparent attempt to respond to the failings in his fraud claim that were highlighted in WGU's first motion to dismiss, Plaintiff has significantly altered his fraud allegations.  In so doing, however, Plaintiff has merely further confused his claim and run afoul of the pleading requirements for a fraud claim.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed.R.Civ.P. 9(b).  "The requirements of Rule 9(b) must be read in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct, . . . and to be construed as to do substantial

justice.'"  *Schwartz v. Celestial Seasonings, Inc.,*124 F.3d 1246, 1252 (10th Cir. 1997).  "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."  *United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc.,* 232 F.3d 902, 2000 WL 1595976, at *3 (10th Cir.2000) (unpublished table decision).

An examination of a few paragraphs of the Amended Complaint under the heading "Fraudulent Misrepresentation" demonstrates that Plaintiff has failed his Rule 9(b) obligations. For example, paragraph 38 describes WGU's alleged misrepresentation as follows:  "The allegations of which involved bomb and gun threats as well as potential and future and economic relations with the company and with future companies that related to Mr. Taylor's employment claiming that he had intentions to cause severe and gross harm to individuals and to their persons, life and limbs and a mass scale."  (Am. Compl. ¶ 38.)  This sentence fragment is apparently Plaintiff's attempt to allege inducement:  "The action of which induced Mr. Taylor to be placed on administrative leave and be ultimately terminated."  (*Id.*, ¶ 42.)  These fractured sentences manage to communicate a few details about the general nature of the statements Taylor is alleged to have made and the consequences of WGU's investigation.  But the allegations offer no coherent, particularized description of the who, what, where and how of the alleged fraud.  As such, dismissal must follow.

### B.  Even Giving him the Benefit of the Doubt, Plaintiff Fails to State a Fraud Claim.

If it is possible to discern any meaning from Plaintiff's fraud allegations it is that he alleges that there was a misrepresentation that he intended to cause a catastrophe, detonate a weapon of mass destruction, fire a gun in a "school zone," or something similarly cataclysmic. But for this exaggerated allegation to have any meaning in the context of a *prima facie* fraud

claim, Plaintiff must plead that this misrepresentation "'induced'" him to take some kind of action to his injury or damage.  *State v. Apotex Corp.*, 2012 UT 36, ¶ 58 (quoting *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 16).  Plaintiff utterly fails to apprehend this requirement for alleging fraud inasmuch as he alleges the misrepresentation "induced *the University* to act . . . ." (Am. Compl. ¶ 39 (emphasis added)); *see also id.,* ¶ 42 (stating Plaintiff was "induced . . . to be . . . terminated.")  This allegation demonstrates that Plaintiff has gotten the most critical elements of his fraud claim completely backwards.  WGU is not the plaintiff or the one to be induced.  Plaintiff must show that he was induced by the fraud.  *Apotex*, 2012 UT 36, ¶ 58. Lacking a proper allegation of inducement, Plaintiff has failed to state a claim for fraud and dismissal must follow.

To the extent that Plaintiff is also pleading a fraudulent concealment claim, that claim likewise fails.  In order to state a claim of fraudulent concealment, a plaintiff must allege "(1) that the nondisclosed information is material, (2) that the nondisclosed information is known to the party failing to disclose, and (3) *that there is a legal duty to communicate*." *Mitchell v. Christensen,* 2001 UT 80, ¶ 9 (emphasis added).  Here, it appears that Plaintiff is arguing that WGU fraudulently concealed the results of its investigation and the identity of any witnesses to Plaintiff's inappropriate conduct.  (Am. Compl. ¶¶ 45-48.)  Utah has never recognized that a private employer has a legal duty to report the results of an internal investigation.  In any event, Plaintiff has not alleged that WGU's human resources department concealed the details of the investigation to induce Plaintiff to act (as opposed to for the purposes of investigating a threat of workplace violence), or that Plaintiff relied on the omission to his damage.  *Apotex Corp.*, 2012 UT 36, ¶ 58.  Thus, Plaintiff has also failed to state a claim for fraudulent concealment.

## VI.   PLAINTIFF FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Again, Plaintiff has failed to adequately plead WGU's vicarious liability for the alleged conduct underlying Plaintiff's intentional infliction of emotional distress claim.  Further, it has already been established that the exclusive remedy for work-related accidents is the workers' compensation scheme.  Utah Code § 34A–2–105(1).  The workers' compensation bar applies to claims for intentional infliction of emotional distress.  *Mounteer v. Utah Power & Light Co.*, 823 P.2d 1055, 1058 (Utah 1991) (barring emotional distress claim as exclusive province of workers' compensation scheme).  While an employee can escape this bar by alleging that an employer intended the injury sued for, Plaintiff still must plead that the tortious actor had "a specific mental state in which the [agent] knew or expected that injury would be the consequence of his action."  *Helf*, 2015 UT 81, ¶ 23.  Plaintiff has made no effort to make this required showing.  Instead, Plaintiff focuses all of his pleading allegations on what he contends is the unfounded nature of the report to the human resources department and the anxiety the report caused him.  (Am. Compl. ¶¶ 71-78.)  But Plaintiff never alleges specific facts to show that WGU knew or expected such injuries to follow.  Hence, Plaintiff's intentional infliction of emotional distress claim must be dismissed.

Plaintiff's intentional infliction of emotional distress claim also fails for *prima facie* reasons.  To state a claim for intentional infliction of emotional distress, "a plaintiff must allege that the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; *and* his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality."

*Franco v. Church of Jesus Christ of Latter-day Saints,* 2001 UT 25, ¶ 25 (citation and internal

quotation marks omitted).  "To be considered outrageous, the conduct must evoke outrage or

revulsion; it must be more than unreasonable, unkind, or unfair."  *Id.,* ¶ 28 (internal quotation

marks omitted).  Conduct "is not necessarily outrageous merely because it is tortious, injurious,

or malicious, or because it would give rise to punitive damages, or because it is illegal."  *Id.*

(quoting 86 C.J.S. *Torts* § 70, at 722–23).  Thus, a "defendant's conduct is outrageous only

where that conduct is extraordinarily vile, atrocious, and utterly intolerable in a civilized

community."  *Thomas v. Vacuums*, No. 2:09-CV-00737-CW, 2010 WL 2671382, at *4 (D. Utah

June 30, 2010) (citation and internal quotation marks omitted).

      Traditionally, intentional infliction of emotional distress claims have presented plaintiffs

with "a high bar, and courts have been unsympathetic to former employees suing over their

terminations."  *Id.*  Under Utah law, "mere discharge from employment does not constitute

outrageous or intolerable conduct by an employer."  *Dubois v. Grand Cent.*, 872 P.2d 1073, 1078

(Utah Ct. App. 1994).  "Nor does the additional fact that [a] plaintiff was given a false reason for

his dismissal rise to the level of outrageous or intolerable conduct necessary for a claim of

emotional distress . . . ."  *Sperber v. Galigher Ash Co.*, 747 P.2d 1025, 1028–29 (Utah 1987).

"Otherwise, any employee who believed his employer had given a false reason for his

termination would have a claim for intentional infliction of emotional distress."  *Id.* at 1029.

      For example, in *Robertson v. Utah Fuel Co.*, a supervisor, who claimed he was required

to confess his drug addiction to his employees and was then terminated, had not alleged facts

sufficiently outrageous to maintain an infliction of emotional distress claim.  889 P.2d 1382,

1389–90 (Utah Ct. App. 1995).  And, most similar to the case at bar, in *Dubois*, the court held

that a plaintiff's discharge, even if that "discharge may have been based on incorrect

information, does not rise to the level of outrageous or intolerable conduct necessary to establish a *prima facie* claim of emotional distress."  872 P.2d at 1078.  In view of this controlling law, the conduct Plaintiff alleges does not arise to the required level of outrageous or intolerable conduct to sustain his claim.

## VII.   PLAINTIFF FAILS TO ALLEGE A CLAIM FOR INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS.

This claim likewise fails for Plaintiff's failure to adequately plead WGU's vicarious liability for the conduct underlying his interference claim.  In any event, to state a claim for intentional interference with economic relations, a plaintiff must allege "'(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff.'"  *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70 (quoting *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982)) (alteration in original).

Here, Plaintiff alleges that WGU intentionally interfered with his present and future economic relationships *with WGU*.  (Am. Compl. ¶ 71.)  Setting aside the fact that Plaintiff was an at-will employee and therefore could be terminated at any time, for any reason, a party cannot interfere in its own economic relationship.  *See Seal v. Young*, No. 2:10-CV-790 TS, 2010 WL 4720738, at *3 (D. Utah Nov. 12, 2010) ("Thus, when a party only interferes with its own contractual duties, the interference amounts to a breach of contract—not a tort."); *see also Vasquez v. Trinity Mission Health*, No. 2:11-CV-01002-EJF, 2013 WL 4095157, at *21 (D. Utah Aug. 13, 2013) (holding that former employee's tortious interference claim failed as a matter of law because employer defendant "cannot tortiously interfere with its own business.")

Plaintiff also alleges that WGU interfered with his future economic relations with unspecified "future companies" and "future employers" by failing to communicate the results of its investigation, and by including a confidentiality provision in the Severance Agreement.  (Am. Compl. ¶¶ 72, 74.)  However, this, too, is insufficient.  "To sufficiently plead the first element of a claim for interference with contractual relations, a plaintiff cannot rest on conclusory allegations that it has existing or potential economic relations."  *Proctor & Gamble Co. v. Haugen*, 947 F. Supp. 1551, 1556 (D. Utah 1996).  Instead, a plaintiff must "allege facts showing . . . a potential contract or business opportunity *with a third party or an identifiable class of third persons*."  *Id.* at 1556–57 (emphasis added).  Plaintiff has failed to identify any potential business opportunity with a third party or an identifiable class of third persons.

Finally, Plaintiff has not alleged the required element of improper means necessary to support his interference with business relations claims.  There is nothing improper about offering a separated employee a severance agreement, including one that contains a confidentiality provision.  To the extent Plaintiff asserts that his defamation claim satisfies the improper means requirement, he was not defamed because, as set forth above, he has not properly pled a defamation claim.  (*Supra*, pp. 1-15.)  Even if he could assert a *prima facie* case of defamation, WGU is not vicariously liable for the unnamed employee's defamation, as established above. (*Supra*, pp. 15-20.)  Plaintiff's interference claim is lodged against WGU and necessarily, it is WGU who must have acted with improper means.  *Eldridge*, 2015 UT 21, ¶70.  Because Plaintiff has failed to adequately plead that WGU was vicariously liable for the unnamed employee's alleged defamation, Plaintiff has failed to establish WGU acted with improper means, and dismissal of this claim must follow.

VIII.    **PLAINTIFF FAILS TO ALLEGE A CLAIM FOR BREACH OF CONTRACT OR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.**

The Court may easily dispense with Plaintiff's contract-based claims, beginning with his breach of contract claim, where Plaintiff fails to plead the obviously essential element of such a claim, i.e., a contract. *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15.  Plaintiff has not pled the existence of any contract and therefore his status of as an at-will employee is presumed. *See Johnson v. Morton Thiokol, Inc*., 818 P.2d 997, 1000 (Utah 1991) (holding that "an employee hired for an indefinite period is presumed to be an employee at will who can be terminated for any reason whatsoever . . . .").  Moreover, in WGU's Employee Handbook – which Plaintiff quotes at length – Plaintiff repeatedly acknowledged that his employment was "at-will" and could be terminated at any time, for any reason.  (*See* Employee Handbook at 7, 13, 21, 24, and 36, relevant portions of which are attached hereto as Exhibit 2.)  As such, Plaintiff was subject to termination for any reason whatsoever and thus, his breach of contract claim fails. *Johnson*, 818 P.2d at 1000.

Nor was there an implied-in-fact contract between WGU and Plaintiff.  Even if Plaintiff had cited some source of implied-in-fact-contract terms, WGU's handbook contained an at-will disclaimer that disclaimed contractual effect from any such terms.  (*See* Employee Handbook at 5 ("I realize that nothing contained in this handbook should be considered either an express or implied contract of employment or any other benefit"), and 7 ("These policies are not contractual employment commitments, and except for the employment-at-will policy, may be changed or revoked at any time.  No policy is intended as a guarantee of terms or conditions of employment or of benefits or rights.").)  In fact the very case cited by Plaintiff in his Amended Complaint demonstrates that a contract disclaimer contained in an employer's policy manual is sufficient to

disclaim a contractual employment relationship, regardless of whether it contained explicit at-will language.  *See Tomlinson v. NCR Corp.*, 2014 UT 55, ¶ 33; (Am. Compl. ¶ 126 (citing *Tomlinson*); *see also Johnson*, 818 P.2d at 1003 ("[A] clear and conspicuous disclaimer, as a matter of law, prevents employee manuals or other like material from being considered as implied-in-fact contract terms.").)  Hence, Plaintiff has not stated, and cannot state, an implied contract claim.

For the similar reasons, Plaintiff has failed to state a claim for breach of the implied covenant of good faith and fair dealing.  Granted, "[a]n implied covenant of good faith and fair dealing inheres in every contract."  *Eggett v. Wasatch Energy Corp.,* 2004 UT 28, ¶ 14, 94 P.3d 193.  However the Utah Supreme Court has "consistently rejected the notion of a free-standing implied covenant of good faith and fair dealing in the absence of a contract."  *Tomlinson*, 2014 UT 55, ¶ 32.  "And the implied covenant cannot 'establish new, independent rights or duties not agreed upon by the parties.'  *Id.* (quoting *Brehany v. Nordstrom, Inc*., 812 P.2d 49, 55 (Utah 1991)*).*  Because Plaintiff has not alleged the existence of a contract – implied or otherwise – he has failed to plead a violation of the covenant of good faith and fair dealing.  Accordingly, Plaintiff's breach of the implied covenant of good faith and fair dealing fails.

## IX.    PLAINTIFF FAILS TO STATE CLAIM FOR WRONGFUL DISCHARGE.

Plaintiff's wrongful termination claim likewise fails.  Plaintiff's wrongful termination claim is founded on an allegation that he was discharged in violation of a public policy.  To state a claim for wrongful discharge in violation of public policy, a plaintiff must alleged that "(1) her employment was terminated; (2) a clear and substantial public policy existed; (3) the plaintiff's conduct implicated that clear and substantial public policy; and (4) the termination and conduct

in furtherance of the public policy are causally connected." *Rackley v. Fairview Care Centers, Inc.*, 2001 UT 32, ¶ 14.

The Utah Supreme Court has identified "four categories that invoke a 'clear and substantial public policy': (1) discharging an employee for 'refusing to commit an illegal or wrongful act'; (2) discharging an employee for 'performing a public obligation'; (3) discharging an employee for 'exercising a legal right or privilege'; and (4) discharging an employee for reporting an employer's criminal activities to the appropriate authorities." *Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 6 (quoting *Ryan v. Dan's Food Stores, Inc.,* 972 P.2d 395, 408 (Utah 1998)). A public policy is "substantial" if it is of "overreaching importance to the public, as opposed to the parties only." *Ryan,* 972 P.2d at 405.  Courts look to "whether the discharge is against public policy and affects a duty which inures to the benefit of the public at large rather than to a particular employer or employee." *Rackley*, 2001 UT 32, ¶ 17.

Plaintiff alleges that he was "unlawfully terminated in violation of public policy when he reported a false claim of an impending bombing . . . ."  (Am. Compl. ¶ 130.)  Setting aside how preposterous this allegation is, it does not demonstrate the violation of a clear and substantial public policy.  In *Fox v. MCI Commc'ns Corp.*, the Utah Supreme Court held that "if an employee reports a criminal violation to an employer, rather than to public authorities, and is fired for making such reports, that does not, . . . contravene a clear and substantial public policy." 931 P.2d 857, 861 (Utah 1997).  That is precisely what Plaintiff claims happened here, and he has not made any other allegations that implicate a clear and substantial public policy.  Hence, Plaintiff's wrongful discharge in violation of public policy fails.

31

## X.   PLAINTIFF FAILS TO STATE A RETALIATION CLAIM.

Plaintiff has also alleged a claim for retaliation.[12]  Specifically, Plaintiff appears to claim that he was retaliated against, in violation of public policy, for denying that he ever made a statement about bringing guns and bombs to work.  (Am. Compl. ¶ 130.)  There is no statute or public policy that protects an employee from eventual termination if the employee simply denies an allegation made by an employer.  *See Fox*, 931 P.2d at 861.  Therefore, Plaintiff has failed to state a claim for retaliation and dismissal must follow.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court dismiss Plaintiff's Amended Complaint in its entirety.

DATED this 21st day of December, 2018.

RAY QUINNEY & NEBEKER P.C.


/s/ Robert O. Rice
Robert O. Rice
Jascha K. Clark
*Attorneys for Defendant*

---

[12] Plaintiff has not cited to any case or statute that would help identify what type of retaliation claim he is alleging. That being said, based on context alone, it appears that he is alleging that his termination violated public policy because he was a whistleblower.  (Am. Compl. ¶ 130.)  This is the claim that WGU addresses herein.

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of December, 2018, a true and correct copy of the

foregoing **DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED**

**COMPLAINT** was filed with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to the following:

> Brian K. Jackson
> Brian K. Jackson, LLC
> 341 South Main Street, Suite 500
> Salt Lake City, UT  84111
> brianj@bjacksonlaw.com
>
> *Attorney for Plaintiff*

/s/ Marci Meyers_____

1474000